PEOPLE'S MOJAHEDIN
ORGANIZATION OF
IRAN, Petitioner,

v.

UNITED STATES DEPARTMENT OF
STATE and Madeleine K. Albright,
Secretary of State, Respondents.

Liberation Tigers of Tamil
Eelam, Petitioner,

v.

United States Department
of State, Respondent.

Nos. 97–1648, 97–1670.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 5, 1999.

Decided June 25, 1999.

Jacob A. Stein argued the cause for petitioner in 97–1648. With him on the briefs were George A. Fisher and Ronald G. Precup.

Ramsey Clark argued the cause for petitioner 97–1670. With him on the briefs were Lawrence W. Schilling and Visuvanathan Rudrakumaran.

Douglas N. Letter, Litigation Counsel, U.S. Department of Justice, argued the cause for respondents in 97–1648. With him on the brief were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, John P. Schnitker and H. Thomas Byron, III, Attorneys, U.S. Department of Justice.

John P. Schnitker, Attorney, U.S. Department of Justice, argued the cause for respondent in 97–1670. With him on the brief were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, Douglas N. Letter, Litigation Counsel, U.S. Department of Justice, and H. Thomas Byron, III, Attorney.

Before: WILLIAMS and RANDOLPH, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The Antiterrorism and Effective Death Penalty Act conferred upon the Secretary of State the power to designate "foreign terrorist organizations." 8 U.S.C. § 1189. By order effective October 8, 1997, Secretary of State Madeline K. Albright so designated the People's Mojahedin Organization of Iran and the Liberation Tigers of Tamil Eelam. *See* Designation of Foreign Terrorist Organizations, 62 Fed.Reg. 52,-650 (1997). Both groups have brought

petitions for judicial review of their designations pursuant to 8 U.S.C. § 1189(b)(1).[1]

## I

The statute before us is unique, procedurally and substantively. On the basis of an "administrative record," the Secretary of State is to make "findings" that an entity is a foreign organization engaging in terrorist activities that threaten the national security of the United States. *See* 8 U.S.C. § 1189(a)(2)(A)(i), (3)(A). This language—"findings" on an "administrative record"—is commonplace. We encounter it day in and day out in cases coming from federal agencies. But unlike the run-of-the-mill administrative proceeding, here there is no adversary hearing, no presentation of what courts and agencies think of as evidence, no advance notice to the entity affected by the Secretary's internal deliberations. When the Secretary announces the designation, through publication in the Federal Register, the organization's bank accounts in the United States become subject to seizure and anyone who knowingly contributes financial support to the named entity becomes subject to criminal prosecution. *See* 8 U.S.C. §§ 1189(a)(2)(C), 2339B(a)(1). Any classified information on which the Secretary relied in bringing about these consequences may continue to remain secret, except from certain members of Congress and this court. *See* 8 U.S.C. § 1189(a)(2)(A)(i), (b)(2). There is a provision for "judicial review" confined to the material the Secretary assembled before publishing the designation. *See* 8 U.S.C. § 1189(b)(2). Because nothing in the legislation restricts the Secretary from acting on the basis of third hand accounts, press stories, material on the Internet or other hearsay regarding the organization's activities, the "administrative record" may consist of little else.

We will give the details of the governing provisions in a moment. At this point in a judicial opinion, appellate courts often lay out the "facts." We will not, cannot, do so in these cases. What follows in the next two subsections may or may not be facts. The information recited is certainly not evidence of the sort that would normally be received in court. It is instead material the Secretary of State compiled as a record, from sources named and unnamed, the accuracy of which we have no way of evaluating.

## A

"The Liberation Tigers of Tamil Eelam was founded in 1976 for the purpose of creating a separate Tamil state in Sri Lanka. The group began its war against the Government of Sri Lanka in 1983 and has employed violent means, including bombings and political assassination, to achieve the goal of a separate entity in the North and East of the country. Some 50,000 people are estimated to have died in fourteen years of fighting."[2] "Sri Lankan military and intelligence sources that have reported reliably in the past have identified the Ellalan Force as another alias for the Liberation Tigers of Tamil Eelam," which "will hereafter be referred to as the 'LTTE'." "Headquartered in the Jaffna Peninsula [of Sri Lanka], ... Velupillai Prabhakaran," "the founder and leader of Sri Lanka's LTTE ... organized the insurgency group to pursue an independent homeland for Tamils in Sri Lanka's northern and eastern regions out of frustration over the ethnic discrimination of the Sri Lankan government, according to press reports." "Tamils ... are the mainstay of his organization, according to U.S. military officials."

A February 1995 news story from Hong Kong stated: "Sri Lanka's Tamil Tiger rebels denied plans to assassinate President Chandrika Kumaratunga but tacitly

---

1. Because these separate petitions involve the same statute and similar claims, we decide both in a single opinion.

2. All quotations in this part A are from the public version of the administrative record.

admitted having killed former Indian Premier Rajiv Gandhi, press reports here said Tuesday.... Tigers have also been accused of killing Sri Lankan President Ranasinghe Premadasa in May 1993 and opposition leader Gamini Dissanayake in October last year. However, Tigers have denied all these killings." "[T]he LTTE tried to assassinate leaders of the Tamil Eelam Liberation Organization (TELO)—a Tamil political party—on August 26 [1996]. The President of the party escaped, but a district leader was killed." A report dated July 1996 stated: "A suicide bomb attack by the Liberation Tigers of Tamil Eelam ... narrowly missed killing a key [cabinet minister] and left 25 dead...." A State Department report on terrorist activity in 1996 reported that: "The LTTE has refrained from targeting Western tourists, but a front group—the Ellalan Force—continued to send threatening letters to Western missions and the press."

"The LTTE ... uses its international contacts to procure weapons, communications, and bomb-making equipment. The LTTE exploits large Tamil communities in North America, Europe, and Asia to obtain funds and supplies for its fighters in Sri Lanka."

### B

A CIA Intelligence Research Paper, dated July 1993, reports that the People's Mojahedin Organization of Iran—the MEK, for short—"is the largest and most active Iranian dissident group. Its primary goal is the overthrow of the Iranian Government, after which it would seek to establish a nontheocratic republic.... The MEK's history, marked by violence and terrorism, belies its claim to uphold democratic ideals. Formed in the early 1960s, its origins reflect both Marxist and Islamic influences, and its history is studded with anti-Western activity." [3]

The MEK "collaborated with Ayatollah Khomeini to overthrow the former Shah of Iran. As part of that struggle, they assassinated at least six American citizens, supported the takeover of the U.S. embassy, and opposed the release of American hostages." "[In 1972] the MEK exploded time bombs at more than a dozen sites throughout Tehran, including the Iran–American Society, ... and the offices of Pepsi Cola and General Motors. From 1972–75 ... the Mojahedin continued their campaign of bombings, damaging such targets as the offices of Pan–American Airlines, Shell Oil Company, and British organizations." "The MEK has been unable since the mid–1980s to mount terrorist operations inside Iran on the same scale as its earlier activities because of government repression and the group's lack of popular support." "In June 1987 the MEK formed a military wing, the National Liberation Army of Iran (NLA), which is located in eastern Iraq along the central Iran–Iraq border area." "In April 1992, the MEK used its sympathizers in the United States, Canada, Germany, France, the United Kingdom, Switzerland, the Netherlands, Sweden, Norway, Denmark and Australia to launch virtually simultaneous attacks on Iranian embassies and installations." In March 1994 Reuters and the BBC reported that the MEK "said its fighters attacked and disabled 14 oil pipelines in the north of Khuzistan province during military operations" and took credit for "25 other ... attacks it said took place in Iran between March 8 and March 18."

"The MEK looks to expatriate Iranians who are not members of the organization for financial support and manpower." "Baghdad is the MEK's primary supporter and closest ally." "The MEK has offices and members throughout Europe, North America, the Middle East and in Australia. These offices are responsible for collecting donations from private citizens—especially

3. According to 62 Fed.Reg. at 52,650, the People's Mojahedin Organization of Iran is also known as the Mujahedin-e Khalq, the MEK, the MKO, the PMOI, the Organization of the People's Holy Warriors of Iran and the Sazeman-e Mujahedin-e Khalq-e Iran.

Iranian expatriates—for the MEK and for organizing activities such as demonstrations to show support for the MEK."

## C

Section 1189(a)(1), as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub L. No. 104–132, § 302, 110 Stat. 1214, 1248, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, § 356, 110 Stat. 3009, 3009–644, empowers the Secretary of State to designate a "foreign terrorist organization" if the Secretary finds three things: "(A) the organization is a foreign organization"; "(B) the organization engages in terrorist activity" as defined in the provisions set forth in the margin;[4] and "(C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." Such activities threaten the "national security" when they threaten the "national defense, foreign relations, or economic interests of the United States." *See* 8 U.S.C. § 1189(c)(2).[5] Upon notification that the Secretary plans to designate an organization, the Secretary of the Treasury may require U.S. financial institutions that possess or control assets of that organization to block all financial transactions involving those assets until further directive from him, by Act of Congress or order of a court. *See* 8 U.S.C. § 1189(a)(2)(C).

The knowing provision of material support or resources to a designated organization is a crime punishable by a fine or up to ten years imprisonment, or both. *See* 18 U.S.C. § 2339B(a)(1). Alien members or representatives of designated organizations may not be admitted to the United States. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(IV), (V).

Also, 8 U.S.C. § 1189(a)(8) states that "[i]f a designation under this subsection has become effective under paragraph (1)(B), a defendant in a criminal action shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing." (This last provision seems to contain a miscitation. Paragraph (1)(B) does not deal with a designation's becoming effective; (1)(B) is the paragraph requiring a finding of terrorist activity. It appears that § 1189(a)(8) meant to refer to paragraph (2)(B).)

The judicial review provision states that a designated organization may, within 30 days of publication in the Federal Register, file a petition for judicial review in the United States Court of Appeals for the District of Columbia Circuit. 8 U.S.C.

---

4. Terrorist activity is defined as any activity which is:

> unlawful ... where it is committed (or which, if committed in the United States, would be unlawful under [state or federal law] ), and which involves any of the following:
>
> (I) The hijacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).
>
> (II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.
>
> (III) A violent attack upon an internationally protected person ... or upon the liberty of such a person.

> (IV) An assassination.
> (V) The use of any—
> (a) biological agent, chemical agent, or nuclear weapon or device, or
> (b) explosive or firearm (other than for mere personal monetary gain),
> with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.
> (VI) A threat, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. § 1182(a)(3)(B)(ii).

5. The statute requires the Secretary to notify certain members of the House and Senate before making a designation, but she need not notify the organizations being considered for designation, nor give them an opportunity to be heard. *See* 8 U.S.C. § 1189(a)(2)(A).

§ 1189(b)(1). The court is to look only at the "administrative record" the Secretary has assembled, although "the Government may submit, for ex parte and in camera review, classified information used in making the designation." *See* 8 U.S.C. § 1189(b)(2).

In APA-like language, § 1189(b)(3) provides that the court shall "hold unlawful and set aside a designation the court finds to be" "arbitrary, capricious, an abuse of discretion," "contrary to constitutional right, power, privilege or immunity," "in excess of statutory jurisdiction, authority or limitation," "lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court" or a designation that was not made "in accord[ance] with the procedures required by law." 8 U.S.C. § 1189(b)(3).

## II

■ These cases bear some resemblance to *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), in which the Attorney General, purportedly acting pursuant to an Executive Order, designated certain organizations as Communist on a list furnished to the Civil Service Commission. No majority opinion emerged, but in separate opinions Justices Black (*id.* at 143, 71 S.Ct. 624), Frankfurter (*id.* at 173, 71 S.Ct. 624), Douglas (*id.* at 176, 71 S.Ct. 624) and Jackson (*id.* at 186–87, 71 S.Ct. 624) stated that the Fifth Amendment's due process clause barred the government from so condemning organizations without giving them notice and opportunity to be heard. In view of *Joint Anti–Fascist Refugee Committee,* and other authorities, the LTTE and the MEK suppose that § 1189 deprived them of due process of law, particularly since the Secretary's designations had the effect of making it a crime to donate money to them. *Compare Paul v.*

*Davis,* 424 U.S. 693, 704–05, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

■ We put to one side situations in which an organization's bank deposits were seized as a result of the Secretary's designation. Neither the LTTE or the MEK suffered that fate, presumably because no United States financial institutions held any of their property. From all that appears, the LTTE and the MEK have no presence in the United States. Their status as foreign is uncontested. This serves to distinguish them from the organizations named as Communist in the *Joint Anti–Fascist Refugee* case. Those were domestic entities. A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise. "[A]liens receive constitutional protections [only] when they have come within the territory of the United States and developed substantial connections with this country." *United States v. Verdugo–Urquidez,* 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).[6] No one would suppose that a foreign nation had a due process right to notice and a hearing before the Executive imposed an embargo on it for the purpose of coercing a change in policy. *See Regan v. Wald,* 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984).

Whatever rights the LTTE and the MEK enjoy in regard to these cases are therefore statutory rights only. Because Congress so allowed, the LTTE and the MEK are entitled to contest their designations on the grounds set forth in § 1189(b)(3). Under the statute, they may for instance seek our judgment about whether the Secretary followed statutory procedures, or whether she made the requisite findings, or whether the record she assembled substantially supports her findings.

---

**6.** Because the issue is not before us, we do not decide whether § 1189 deprives those in the United States of some constitutional right

if they are members of, or wish to donate money to, an organization designated by the Secretary.

■ But even this puts the matter too broadly, the government tells us. Of the three findings mandated by § 1189(a)(1), the third—"(C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States"—is nonjusticiable. *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), holds that it is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch. These are political judgments, "decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." 333 U.S. at 111, 68 S.Ct. 431. *See, e.g., Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981).

■ May we nevertheless conduct judicial review limited to determining whether the Secretary complied with the remaining portions of § 1189(a)? The question arises because it is the Secretary's *designation* that we are supposed to review according to 8 U.S.C. § 1189(b)(1): "Not later than 30 days after publication of the designation in the Federal Register, an organization designated as a foreign terrorist organization may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit." If we are not competent to pass upon the Secretary's national security finding under § 1189(a)(1)(C), and we interpret *Waterman* to hold that we are not, how can we perform the function Congress assigned to us, which is to pass upon the validity of the *designation*?[7] For all we know, the designation may be improper because the Secretary's judgment that the organization threatens our nation-

al security is completely irrational, and devoid of any support. Or her finding about national security may be exactly correct. We are forbidden from saying. That we cannot pronounce on the question does not mean that we must assume the Secretary was right. It means we cannot make any assumption, one way or the other.

■ So the question remains: may we perform the checking function of judicial review by ignoring (C) and just pronouncing on (A) and (B)? *Waterman* has some bearing on the issue. There the Civil Aeronautics Board issued a proposed order disposing of 29 applications from 15 United States carriers to engage in overseas operations. *See Waterman,* 333 U.S. at 116 n. 5, 68 S.Ct. 431. Pursuant to statute, such CAB orders (regardless whether the order granted or denied the application) had to be approved by the President before becoming final. In *Waterman* the President approved the CAB's consolidated order. This had the effect of granting Chicago & Southern's application and denying Waterman's. *See id.* at 104–05, 68 S.Ct. 431. The statute contained a provision allowing for judicial review of such CAB orders (although not orders granting or denying routes to foreign carriers). The court of appeals believed that it "could not review such provisions of the order as resulted from Presidential direction," *see id.* at 111, 68 S.Ct. 431, and as we have said, the Supreme Court majority (and the dissenters too) agreed. But the Court disagreed with the court of appeals that it could nevertheless review whatever portion of the CAB's order had not resulted from the President's foreign policy judgment. (On this point the Court divided 5–4.) The Court viewed the CAB orders as merely

---

7. In cases on appeal from the district court, we are to review "judgments, not opinions." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Orders issued by agencies are treated differently. In administrative law, we do not sustain a "right-result,

wrong-reason" decision of an agency. We send the case back to the agency so that it may fix its reasoning or change its result. *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943), explains the difference.

advisory until the President acted. After the President acted, even if he changed nothing the CAB had decided, "the final orders embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate." *See id.* at 114, 68 S.Ct. 431.

One might suppose that, by analogy, the Secretary's designations also "embody . . . discretion as to political matters beyond the competence of the courts to adjudicate." *See id.* But there is a difference between the statutory system in *Waterman* and the statutory system we have before us. Apart from the fact that the President did not need to make any particular findings to approve, modify or reject a proposed CAB order, the order could not be effective without Presidential action. The President's action was not limited to a "mere right of veto." *See id.* at 109, 68 S.Ct. 431. The President could, for instance, set aside CAB orders refusing to authorize air transportation. *See id.* Judicial review of the CAB's action, then, would have amounted to rendering an advisory opinion. 333 U.S. at 113–14, 68 S.Ct. 431. Not so here. If we were to determine that the Secretary failed to comply, or did comply, with § 1189(a)(1)(A) and (B), there would be nothing advisory about our opinion. We would uphold, or set aside, the Secretary's determination on that ground. Judicial review, as thus limited, performs the role Congress intended without thrusting the judiciary into the political realm.

■ With subsection (C) out of the picture, all that remains to be examined—in view of the arguments the LTTE and the MEK present—is the Secretary's findings that these organizations are "foreign" and that they "engage[ ] in terrorist activity" (8 U.S.C. § 1189(a)(1)(A) & (B)). The LTTE, but not the MEK, contests whether it is a "foreign organization" within the meaning of the statute. According to the LTTE, it is instead a government. The LTTE assumes a difference between a foreign organization and a foreign government. Only in the definition of terrorist activities is there a hint that Congress meant to draw such a distinction. *See* 8 U.S.C. § 1182(a)(3)(B)(ii)(II). In any event, the United States replies that a court cannot make the determination the LTTE wants because recognizing foreign states is solely entrusted to the political branches, and the United States has not recognized the LTTE. "Who is the sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government." *Jones v. United States*, 137 U.S. 202, 212–13, 11 S.Ct. 80, 34 L.Ed. 691 (1890). Here, the Secretary determined that the LTTE was a foreign organization and, in the words of the statute, there is "substantial support" for her finding in the materials she has furnished us as an "administrative record." 8 U.S.C. § 1189(b)(3)(D).[8]

■ We also believe that the record, as the Secretary has compiled it, not surprisingly contains "substantial support" for her findings that the LTTE and the MEK engage in "terrorist activities" within the meaning of 8 U.S.C. § 1182(a)(3)(B). We have already recounted, above, enough of the record to show that the Secretary had before her information that each of the organizations engaged in bombing and killing in order to further their political agendas. Any one of the incidents attributed

---

8. Section 1189(b)(3), although generally parroting the language of the Administrative Procedure Act, modified the "substantial evidence" standard of 5 U.S.C. § 706(2)(E) to say instead "substantial support." Perhaps this was in recognition of the decision of this court that whenever a statute requires the agency action to be supported by "substantial evidence"—a term of art in administrative law—there must be "some sort of adversary, adjudicative-type procedures" before the agency. *Mobil Oil Corp. v. FPC*, 483 F.2d 1238, 1259 (D.C.Cir.1973).

to the LTTE and to the MEK would have sufficed under the statute.

We therefore refuse to set aside either designation. In so deciding we are not—in the words of *Mistretta v. United States*, 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)—allowing the reputation of the Judicial Branch to be "borrowed by the political Branches to cloak their work in the neutral colors of judicial action." We reach no judgment whatsoever regarding whether the material before the Secretary is or is not true. As we wrote earlier, the record consists entirely of hearsay, none of it was ever subjected to adversary testing, and there was no opportunity for counter-evidence by the organizations affected. As we see it, our only function is to decide if the Secretary, on the face of things, had enough information before her to come to the conclusion that the organizations were foreign and engaged in terrorism. Her conclusion might be mistaken, but that depends on the quality of the information in the reports she received—something we have no way of judging.

We have considered and rejected the other arguments petitioners have raised and see no need to burden this opinion with a discussion of them.

*The petitions for review are denied.*