251 F.3d 192 (D.C. Cir. 2001)
 National Council of Resistance of Iran and National Council of Resistance of Iran, U.S. Representative Office, Petitioners
v.
Department of State and Madeleine K. Albright, Secretary of State, Respondents
 No. 99-1438, 99-1439
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued November 15, 2000
Decided June 8, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 On Petitions for Review of an Order of the Secretary of State
 Martin D. Minsker argued the cause for petitioners National Council of Resistance of Iran and National Council of Resistance of Iran, U.S. Representative Office. With him on the briefs were Scott L. Nelson, Ellen Fels Berkman and Jody Manier Kris.
 Jacob A. Stein argued the cause for petitioner People's Mojahedin Organization of Iran. With him on the briefs were George A. Fisher and Ronald G. Precup.
 Douglas N. Letter, Litigation Counsel, U.S. Department of Justice, argued the cause for respondents. With him on the briefs were David W. Ogden, Acting Assistant Attorney General, H. Thomas Byron, III, Attorney, and Wilma A. Lewis, U.S. Attorney at the time the briefs were filed.
 Before: Edwards, Chief Judge, Sentelle and Henderson, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Sentelle.
 Sentelle, Circuit Judge:
 
 
 1
 Two organizations, the National Council of Resistance of Iran and the People's Mojahedin of Iran, petition for review of the Secretary's designation of the two as constituting a "foreign terrorist organization" under the Anti-Terrorism and Effective Death Penalty Act of 1996, raising both statutory and constitutional arguments. While we determine that the designation was in compliance with the statute, we further determine that the designation does violate the due process rights of the petitioners under the Fifth Amendment, and we therefore remand the case for further proceedings consistent with this opinion.
 
 The Statute
 
 2
 Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("Anti-Terrorism Act" or "AEDPA"), 8 U.S.C. 1189, the Secretary of State is empowered to designate an entity as a "foreign terrorist organization." Id. See generally People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17 (D.C. Cir. 1999). The consequences of that designation are dire. The designation by the Secretary results in blocking any funds which the organization has on deposit with any financial institution in the United States. 18 U.S.C. 2339B(a)(2). Representatives and certain members of the organization are barred from entry into the United States. 8 U.S.C. 1182(a)(3)(B)(i)(IV & V). Perhaps most importantly, all persons within or subject to jurisdiction of the United States are forbidden from "knowingly providing material support or resources" to the organization. 18 U.S.C. 2339B(a)(1).
 
 
 3
 Despite the seriousness of the consequences of the determination, the administrative process by which the Secretary makes it is a truncated one. In part, the AEDPA imposes the Secretary's duties in "APA-like language." People's Mojahedin, 182 F.3d at 22. The Secretary compiles an "administrative record" and based upon that record makes "findings." Cf. Administrative Procedure Act, 5 U.S.C. 557(c). If the Secretary makes the critical findings that "an entity is a foreign organization engaging in terrorist activities that threaten the national security of the United States," People's Mojahedin, 182 F.3d at 19 (construing 8 U.S.C. 1189), that entity then suffers the consequences listed above.
 
 
 4
 Following the administrative designation there is judicial review. 8 U.S.C. 1189(b). While that statutory procedure, so far as it goes, sounds like the familiar procedure normally employed by the Congress to afford due process in administrative proceedings, the similarity to process afforded in other administrative proceedings ends there. As we have observed before, this "statute ... is unique, procedurally and substantively." People's Mojahedin, 182 F.3d at 19. The unique feature of this statutory procedure is the dearth of procedural participation and protection afforded the designated entity. At no point in the proceedings establishing the administrative record is the alleged terrorist organization afforded notice of the materials used against it, or a right to comment on such materials or the developing administrative record. Nothing in the statute forbids the use of "third hand accounts, press stories, material on the Internet or other hearsay regarding the organization's activities...." Id. at 19. The Secretary may base the findings on classified material, to which the organization has no access at any point during or after the proceeding to designate it as terrorist.
 
 
 5
 The entity may obtain judicial review by application to this court not later than thirty days after the publication of the designation in the Federal Register. 8 U.S.C. 1189(b)(1). But that review is quite limited. Review is based solely upon the administrative record. Granted this is not in itself an unusual limitation, but one common to many administrative reviews. However, under the AEDPA the aggrieved party has had no opportunity to either add to or comment on the contents of that administrative record; and the record can, and in our experience generally does, encompass "classified information used in making the designation," as to which the alleged terrorist organization never has any access, and which the statute expressly provides the government may submit to the court ex parte and in camera. Id. 1189(b)(2).
 
 
 6
 The scope of judicial review is limited as well. We are to hold unlawful and set aside designations that we find to be
 
 
 7
 (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
 
 
 8
 (B) contrary to constitutional right, power, privilege, or immunity;
 
 
 9
 (C) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right;
 
 
 10
 (D) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under paragraph (2), or
 
 
 11
 (E) not in accord with the procedures required by law.
 
 
 12
 Id. 1189(b)(3). Again, this limited scope is reminiscent of other administrative review, but again, it has the unique feature that the affected entity is unable to access, comment on, or contest the critical material. Thus the entity does not have the benefit of meaningful adversary proceedings on any of the statutory grounds, other than procedural shortfalls so obvious a Secretary of State is not likely to commit them.
 
 
 13
 Designations under the statute persist for two years and are renewable for additional two-year periods by the same procedure as the original designation. Id. 1189(a)(4)(B). In the decisions now under review, we consider two petitions under 1189(b).
 
 The Petitions
 
 14
 By notice of October 8, 1999, the Secretary of State, inter alia, redesignated petitioner People's Mojahedin of Iran ("PMOI") as a foreign terrorist organization pursuant to 8 U.S.C. 1189. 64 Fed. Reg. 55,112 (1999). The two-year redesignation of the PMOI extended the October 8, 1997 designation of the same group as a terrorist organization. This court rejected a petition for review of the 1997 designation in People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17 (D.C. Cir. 1999). In the 1999 designation, thenSecretary Madeleine Albright for the first time included the designation of the second petitioner before us, the National Council of Resistance of Iran ("NCRI"). The Secretary found that the NCRI is an alter ego or alias of the PMOI.[1] Both petitioners argue that the Secretary's designation deprives them of constitutionally protected rights without due process of law. NCRI argues additionally that the Secretary had no statutory authority to find that it was an alias or alter ego of PMOI. For the reasons set forth below, we agree with the due process argument, while rejecting the statutory claim.
 
 Analysis
 A. The Alias Finding
 1. Record Support
 
 15
 NCRI launches a two-pronged attack on the Secretary's designation of it as an alias for the PMOI. Its first argument is a three-step analysis forwarding the proposition that "the Secretary's alias designation of NCRI has no support in the record." Brief of NCRI at 6. The first step of its reasoning is the generally uncontroversial proposition that "Article III [of the Constitution] forbids courts from rubberstamping Executive decisions." Id. at 7. In support of this premise of its syllogism, counsel reminds us that the courts have rejected interpretations of statutes that "cast Article III judges in the role of petty functionaries ... required to enter as a court judgment an executive officer's decision but stripped of capacity to evaluate independently whether the executive decision is correct." Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 426 (1995). While there will be unreviewable Executive decisions, and legitimate differences of opinion as to which decisions fall within the rubberstamp category condemned in Gutierrez, and which are simply unreviewable decisions, see generally id. at 448-49 (Souter, J., dissenting), we can accept the Council's general proposition for purposes of this discussion and move to the further steps of its three-part analysis.
 
 
 16
 In applying the rubberstamping premise to the present designation of the NCRI as an alias of the PMOI, the Council draws from the Act and from our application of it in People's Mojahedin the principle that designations under the Act must survive a review in which the court determines that the designation has "substantial support in the administrative record taken as a whole or in classified information submitted to the court," 8 U.S.C. 1189(b)(3)(D), and is not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Id. 1189(b)(3)(A).[2] Again, the basic proposition, being drawn from the words of the statute, may be assumed. Although the Council's brief disputes our prior application of the test in People's Mojahedin and seems to invite us to overrule that decision, this panel has no power to do so, even if we were inclined to accept the invitation. See, e.g., LaShawn A. v. Barry, 87 F.3d 1389, 1395 (D.C. Cir. 1996)(en banc) ("One three-judge panel ... does not have the authority to overrule another three-judge panel of the court."); United States v. Kolter, 71 F.3d 425, 431 (D.C. Cir. 1995) ("This panel would be bound by [a prior] decision even if we did not agree with it.").
 
 
 17
 Proceeding from the two premises--that the AEDPA does not require this Court to rubberstamp the Secretary's decision, and that the process of reviewing without rubberstamping involves applying the substantial-record-support and arbitrary-and-capricious standards--the NCRI concludes that we must set aside the designations, as "there is no support in the 1999 SAR [Summary of Administrative Report] for the fundraising allegation." Brief of NCRI at 12. However, that conclusion depends upon our accepting not only the first two steps of the syllogism, but also the Council's factual proposition that the only difference between the 1999 alias designation and the 1997 review in which the Secretary did not designate the Council as an alias of the PMOI is an FBI agent's hearsay declaration concerning the use of the National Council of Resistance name in fundraising for the PMOI in the United States. It is at this point that the Council's reasoning conspicuously founders, even if we uncritically accept the first two steps.
 
 
 18
 First, we can neither confirm nor deny that the agent's declaration is the only difference in the record support between the 1997 and 1999 records. We may under the AEDPA consider the entire record before us including any classified submissions under 1189(b)(1)(2). In fact, the "substantial support" test relied upon by the Council expressly empowers us to set aside the designations only if they "lack[ ] substantial support in the administrative record taken as a whole or in classified information submitted to the courts under paragraph (2)." 8 U.S.C. 1189(b)(3)(D). As we recognized in People's Mojahedin, "we will not, cannot," in a case under this statute "lay out the 'facts.' " 182 F.3d at 19. As we further recognized in that decision, our only function in reviewing a designation of an organization as a foreign terrorist organization "is to decide if the Secretary, on the face of things, had enough information before her to come to the conclusion that the organizations were foreign and engaged in terrorism." Id. at 25. We see no greater function for our review of the alias designation. We have, as the statute mandates, reviewed the administrative record taken as a whole and the classified information submitted to the court. We conclude that the Secretary's designation of the National Council of Resistance as an alias for the PMOI does not lack substantial support and that designation is neither arbitrary, capricious, nor otherwise not in accordance with law.
 
 
 19
 The Council argues that we must nonetheless strike down the alias designation in 1999 because the State Department in 1997 determined that the NCRI was not an alias of PMOI. In the Council's view, this new designation is barred by the principle that "when an executive agency switches position, it must provide a reasoned explanation for the change." Brief of NCRI at 16 (citing Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983)). Again, the principle of law offered by the Council is incontrovertible, but it does not apply to this case. If the Secretary had taken the 1997 record and reached a different conclusion, presumably she would have to offer us some reason for the change. Whether this reason would have to be disclosed to the appellants is arguable given the role of classified material in reviews under this statute but she might at least have been required to explain to the court the reason for the change. However, the Secretary was not acting on the same record. There is no logical reason for concluding that there has been no change in either the facts or the Secretary's knowledge of the facts between the 1997 refusal to designate and the 1999 designation. In short, on the record at hand, we cannot find that the Secretary erred in her application of the statute. We therefore must affirm that designation unless the Secretary overstepped either statutory or constitutional authority.
 
 
 20
 2. The Statutory Authority for the Alias Device
 
 
 21
 The Council's second argument is that the Secretary has made no statutory finding that the NCRI meets the three elements for designation as a foreign terrorist organization: That is, that the Council is (1) a foreign terrorist organization, (2) engaging in terrorist activities that (3) threatens the national security of the United States. People's Mojahedin, 182 F.3d at 19 (construing 8 U.S.C. 1189). Only in one sense is this true. That is, the Secretary did not expressly find that the NCRI is that sort of organization doing those sorts of things under its own name. The Secretary did, however, find that the PMOI is a foreign organization engaging in terrorist activities to threaten the national security of the United States, and that the NCRI and the PMOI are one and the same. This is tantamount to finding that the NCRI itself meets those criteria. Logically, indeed mathematically, if A equals B and B equals C, it follows that A equals C. If the NCRI is the PMOI, and if the PMOI is a foreign terrorist organization, then the NCRI is a foreign terrorist organization also.
 
 
 22
 The Council argues, without citation of authority, that because the statute does not expressly allow for an alias designation, the rationale followed by the Secretary in the present case is beyond her statutory power. Again, this argument fails. It is true that the Secretary, like any federal agency, has no power, no "capacity to act" except by "delegation of authority ... from the legislature." Railway Labor Executives' Ass'n v. Nat'l Mediation Bd., 29 F.3d 665, 670 (D.C. Cir. 1994) (en banc). It is also true that Congress did not expressly empower the Secretary to use the alias rationale. It is further true, however, that the delegation from Congress may be "either expressed or implied." Id. Here, the power to designate an organization as a foreign terrorist organization if it commits the necessary sort of terrorist acts under its own name implies the authority to so designate an entity that commits the necessary terrorist acts under some other name.
 
 
 23
 It would simply make no sense for us to hold that Congress empowered the Secretary to designate a terrorist organization--so as to block any funds which such organization has on deposit with any financial institution in the United States, to bar its representatives and many or most of its members from entry into the United States, and to prevent anyone in the United States from providing material resources or support the organization--only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have enjoyed had it never been designated. If the Secretary has the power to work those dire consequences on an entity calling itself "Organization A," the Secretary must be able to work the same consequences on the same entity while it calls itself "Organization B." We cannot presume that Congress intended so vain an act as the Council's argument would have us conclude. Cf. First National City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611 (1983) (Cuban bank established by Cuban government as separate judicial entity would not be so treated due to the relationship between the bank and the Cuban government).
 
 
 24
 As this is the last of the statutory arguments advanced by either petitioner, the designations before us must stand, unless they fail on constitutional grounds.
 
 B. The Due Process Claim
 
 25
 Both petitioners assert that by designating them without notice or hearing as a foreign terrorist organization, with the resultant interference with their rights to obtain and possess property and the rights of their members to enter the United States, the Secretary deprived them of "liberty, or property, without due process of law," in violation of the Fifth Amendment of the United States Constitution. We agree. The United States's defense against the constitutional claims of the petitioners is two-fold: (1) that the petitioners have no protected constitutional rights and (2) that even if they have such rights, none are violated. Both lines of defense fail.
 
 1. The Presence of Petitioners
 
 26
 We consider first the eligibility of the petitioners for constitutional protection. In resisting the claims of the PMOI to due process protection, the government asserts that "nearly all of these arguments are foreclosed by the binding precedent of this Court in the People's Mojahedin published decision, where this Court rejected those same arguments." Brief of the Secretary at 20. In fact, in that decision this court rejected only the statutory arguments. We did so after concluding that the petitioners in that case had established no constitutional entitlement because "a foreign entity without property or presence in this country has no constitutional rights, under the Due Process Clause or otherwise." People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999). We left the constitutional questions for such time as a designated foreign terrorist organization might be able to establish its constitutional presence in the United States. Therefore, that decision cannot foreclose constitutional claims asserted by the PMOI in this case unless for some reason it forecloses the possibility of our concluding that the entities before us now have a presence in this country. It does not.
 
 
 27
 First, for People's Mojahedin to foreclose any question as to the NCRI, the government must rely on the two entities being one, a proposition we have been willing to accept for purposes of the alias designation which brings NCRI within the ambit of the terrorist designation bestowed upon the PMOI. Even accepting their identity for all purposes, the People's Mojahedin decision cannot foreclose our reconsideration of the presence question, just as the 1997 failure to designate the NCRI as an alias for the PMOI did not bar the Secretary from reconsidering that question in 1999. We accepted, and continue to accept, the government's proposition in support of the 1999 designation that the record is not the same and the decision is not the same as in 1997. Therefore, the fact that the PMOI had not established a constitutional presence in the United States in 1997 under its own name cannot possibly establish that neither the PMOI nor the NCRI had established a presence by 1999. And while we accept the government's proposition that neither the record nor the classified information establishes a presence for the PMOI under its own name, we cannot agree that the same is true as to the NCRI.
 
 
 28
 The government admits that the record before us reflects that the NCRI "has an overt presence within the National Press Building in Washington, D.C.," and further recognizes that the NCRI claims an interest in a small bank account. The government attempts to blow this away by saying that foreign entities " 'receive constitutional protections [only] when they have come within the territory of the United States and developed substantial connections within this country.' " Brief of the Secretary at 39 (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990)) (bracketed material and emphasis added by the Secretary). Accepting that quotation, with the bracketed addition of "only" at face value, the Secretary asserts that this evidence in the record would not support a conclusion that the Council has developed substantial connections. On that basis, the Secretary then asserts that the NCRI is not entitled to constitutional protection. We reject the Secretary's position for multiple reasons.
 
 
 29
 First, the Secretary's construction of the quotation from Verdugo-Urquidez is misleading. In context, the full sentence by the Supreme Court did contain the word "only" but not in the same position as the government brackets it. The High Court rejected the application of several prior cases-Plyler v. Doe, 457 U.S. 202 (1982); Kwong Hai Chew v. Colding, 344 U.S. 590 (1953); Bridges v. Wixon, 326 U.S. 135 (1945); Russian Volunteer Fleet v. United States, 282 U.S. 481 (1931); Wong Wing v. United States, 163 U.S. 228 (1896); and Yick Wo v. Hopkins, 118 U.S. 356 (1886)--which were offered by an alien who had been arrested. The Court stated:
 
 
 30
 These cases, however, establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.
 
 
 31
 Verdugo-Urquidez, 494 U.S. at 271 (emphasis added). The critical adverb limits the application of prior precedent. In Verdugo-Urquidez, the Court rejected the claims of a Mexican citizen arrested in Mexico to constitutional protections under the United States Constitution outside the United States. Neither the word "only" nor anything else in the holding purports to establish whether aliens who have entered the territory of the United States and developed connections with this country but not substantial ones are entitled to constitutional protections.
 
 
 32
 In any event, we are not undertaking to determine, as a general matter, how "substantial" an alien's connections with this country must be to merit the protections of the Due Process Clause or any other part of the Constitution. Rather, we have reviewed the entire record including the classified information and determine that NCRI can rightly lay claim to having come within the territory of the United States and developed substantial connections with this country. We acknowledge that in reviewing the whole record, we have included the classified material. As we noted above and in People's Mojahedin, we will not and cannot disclose the contents of the record. We note further that the PMOI has made little serious assertion of an independent presence in the United States. Unfortunately for the cause of the Secretary, the PMOI does not need one. Insofar as PMOI's claimed presence is concerned, the United States is now hoist with its own petard. The Secretary concluded in her designation, which we upheld for the reasons set forth above, that the NCRI and the PMOI are one. The NCRI is present in the United States. If A is B, and B is present, then A is present also.
 
 
 33
 The Secretary offers one further argument for the proposition that petitioners are not entitled to the protection of the Due Process Clause. The Secretary asserts that the United States exercises the powers of external sovereignty independent of the affirmative grants of the Constitution as an inherent attribute of sovereignty under international law. See, e.g., Kleindienst v. Mandel, 408 U.S. 753, 765 (1972). As a result of that sovereignty, the Secretary contends, the government interacts with foreign entities not within the constitutional framework, but through the system of international law and diplomacy. Specifically, the Secretary asserts that "foreign governmental entities therefore 'lie[ ] outside the structure of the union.' " Brief of the Secretary at 35 (quoting Principality of Monaco v. Mississippi, 292 U.S. 313, 330 (1934)). This argument need not detain us long.
 
 
 34
 It is certainly true that sovereign states interact with each other through diplomacy and even coercion in ways not affected by constitutional protections such as the Due Process Clause. However, since neither the PMOI nor the NCRI is a government, none of the authorities offered by the Secretary have any force. The closest the Secretary can come is to assert that the Council has described itself as a "government in exile." That untested claim is not sufficient by itself to bring the Council within the ambit of authorities governing the interrelationship of two sovereigns. If the United States were to recognize the Council as a government, or even perhaps to deal with it as if it were a government, then the result might be different. But on the present record, the Secretary has deemed the Council to be nothing but a foreign terrorist organization, and it is as such that the Secretary must litigate with that entity.
 
 
 35
 The PMOI and NCRI have entered the territory of the United States and established substantial connections with this country. The cases distinguished by the Verdugo Urquidez Court make plain that both organizations therefore are entitled to the protections of the Constitution. See, e.g., Kwong Hai Chew v. Colding, 344 U.S. at 596 (holding that an alien who permanently resided in the United States was "a person within the protection of the Fifth Amendment" and therefore was entitled to due process); Bridges v. Wixon, 326 U.S. at 148 (holding that a permanent alien resident was entitled to the First Amendment's guarantees of free speech and press); Russian Volunteer Fleet v. United States, 282 U.S. at 489, 491-92 (holding that a Russian corporation whose property was taken by the United States was "an alien friend," and hence deserved protection under the Fifth Amendment's Takings Clause); Wong Wing v. United States, 163 U.S. at 238 (holding that permanent alien residents were entitled to due process under the Fifth Amendment, and indictment by grand jury under the Sixth Amendment); and Yick Wo v. Hopkins, 118 U.S. at 369 (holding that permanent alien residents deserved protection under the Fourteenth Amendment's Due Process Clause). We therefore proceed to consider whether the PMOI and NCRI have been deprived of a constitutional right.
 
 2. The Due Process Claims
 
 36
 a. The deprivation
 
 
 37
 The government argues that even accepting the proposition that petitioners are entitled to the protection of the Due Process Clause of the Fifth Amendment, the designation process and its consequences do not deprive them of life, liberty, or property. The Secretary contends that this question is settled by Paul v. Davis, 424 U.S. 693 (1976), in which the Supreme Court held that the government does not, simply by the act of defaming a person, deprive him of liberty or property rights protected by the Due Process Clause. Id. at 708-10. However, Paul v. Davis held much more than the point for which the government asserts it.
 
 
 38
 That case concerned the stigmatizing of plaintiffs by police officers distributing a flyer listing them among "active shoplifters." In reversing a circuit decision that the dissemination of such information implicated the Due Process Clause, the High Court entered the holding upon which the government relies. But in doing so, it analyzed and distinguished its earlier decision in Wisconsin v. Constantineau, 400 U.S. 433 (1971). In Constantineau, a state statute empowered a local police chief, without notice or hearing to a citizen, to cause a notice to be posted in all retail outlets that that person was one who "by excessive drinking" exhibited specified undesirable "traits, such as exposing himself or family 'to want' or becoming 'dangerous to the peace' of the community." Id. at 434 (quoting Wis. Stat. 176.26 (1967)). The Constantineau Court held that this stigmatizing posting without notice or hearing constituted a violation of the Fifth Amendment Due Process Clause. In explaining its refusal to follow Constantineau, the Paul Court noted specific language from the Constantineau holding:
 
 
 39
 Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and opportunity to be heard are essential. 424 U.S. at 708 (quoting Constantineau, 400 U.S. at 437 (emphasis supplied by the Paul Court)).
 
 
 40
 The Paul Court then went on to note the effects of the excessive drinking posting beyond stigmatization: That is, the posted individual could not purchase or even receive by gift alcoholic beverages within the city limits for one year. Thus, the Paul Court held, the appropriate rule of law is that where the government issues a stigmatizing posting (or designation) as a result of which the stigmatized individual is "deprived ... of a right previously held under state law," due process is required. Id. The deprivation under the Wisconsin statute as described in Paul v. Davis was "the right to purchase or obtain liquor in common with the rest of the citizens." Id.
 
 
 41
 Like the parties in Constantineau, and unlike the parties in Paul, petitioners here have suffered more than mere stigmatization. Rather than being posted as drunkards, the petitioners have been designated as foreign terrorist organizations under the AEDPA. Rather than being deprived of the previously held right to purchase liquor, they have been deprived of the previously held right to--for example--hold bank accounts, and to receive material support or resources from anyone within the jurisdiction of the United States. Many people, presumably including the members of the Council and the PMOI, would consider these to be rights more important than the right to purchase liquor. We consider at least one of them equally entitled to constitutional protection.
 
 
 42
 The most obvious rights to be impaired by the Secretary's designation are the petitioners' property rights. Specifically, there is before us at least a colorable allegation that at least one of the petitioners has an interest in a bank account in the United States. As they are one, if one does, they both do. We have no idea of the truth of the allegation, there never having been notice and hearing, but for the present purposes, the colorable allegation would seem enough to support their due process claims. Russian Volunteer Fleet v. United States, 282 U.S. 481, 491-92 (1931), makes clear that a foreign organization that acquires or holds property in this country may invoke the protections of the Constitution when that property is placed in jeopardy by government intervention. This is not to say that the government cannot interfere with that and many other rights of foreign organizations present in the United States; it is only to say that when it does so it is subject to the Due Process Clause.
 
 
 43
 The other two consequences of the designation less clearly implicate interests protected by the Due Process Clause. As to the right of the members of the organizations to enter the United States, the Secretary argues with some convincing force that aliens have no right of entry and that the organization has no standing to judicially assert rights which its members could not bring to court. See, e.g., Takahashi v. Fish and Game Comm'n, 334 U.S. 410, 419 (1948). The organizations counter that the present act limits the ability to travel abroad of its members who are already in the United States as they know they would be denied readmission.
 
 
 44
 As to the third consequence of the designation--that is the banning of the provision of material support or resources to the organizations--both parties again raise colorable arguments. The petitioners, citing such cases as Apthecker v. Secretary of State, 378 U.S. 500, 507 (1964), and NAACP v. Alabama, 357 U.S. 449 (1958), assert that this limitation deprives their members of First Amendment associational and expressive rights. The government asserts that the limitation does not affect the ability of anyone to engage in advocacy of the goals of the organizations, but only from providing material support which might likely be employed in the pursuit of unlawful terrorist purposes as of First Amendment protected advocacy. See Humanitarian Law Project v. Reno, 205 F.3d 1130, 1133-34 (9th Cir. 2000).
 
 
 45
 On each of the second and third consequences, each side offers plausible arguments. But we need not decide as an initial matter whether those consequences invade Fifth Amendment protected rights of liberty, because the invasion of the Fifth Amendment protected property right in the first consequence is sufficient to entitle petitioners to the due process of law.
 
 
 46
 b. When process is due
 
 
 47
 As petitioners argue, the fundamental norm of due process clause jurisprudence requires that before the government can constitutionally deprive a person of the protected liberty or property interest, it must afford him notice and hearing. Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976). Therefore, petitioners argue that the Secretary was obligated to give them notice of her intent to make the declarations of terrorist status and previous nature, and afford them the opportunity to respond to the evidence upon which she proposed to make those declarations and to be heard on the proper resolution of the questions. Indeed, "[the Supreme] Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." Id. at 333.
 
 
 48
 At the same time, the Supreme Court has made clear that "[i]t is by now well established that ' "due process" unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' " Gilbert v. Homar, 520 U.S. 924, 930 (1997) (quoting Cafeteria and Restaurant Workers v. McElroy, 367 U.S. 886, 895 (1961)). Otherwise put, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Citing Homar, and Morrissey, inter alia, the United States contends that since due process consists only of that process which is due under the circumstances, even given our holding that petitioners are protected by the due process clause, they are not due any procedural protection that they have not already received.
 
 
 49
 When analyzing the petitioners' claims, and the government's defenses, we are mindful that two distinct questions remain for us to determine. We have dispensed with the issue as to whether petitioners are entitled to due process; the questions remaining for us are what due process, and when. That is, to what procedural devices must the petitioners have access in order to protect their interests against the deprivations worked by the statute, and must that access be afforded before the Secretary's declaration, or is it sufficient under the circumstances that such access be available postdeprivation? The government rightly reminds us that the Supreme Court established in Mathews v. Eldridge and indeed even before that decision,
 
 
 50
 that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interests that will be affected by the official action; second, the risk of an erroneous deprivation of such interest of the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.
 
 
 51
 424 U.S. at 335 (citing Goldberg v. Kelly, 397 U.S. 254, 263-71 (1970)). Unlike the advocates before us, we do not have the luxury of blurring the question of what and when. We must determine what process is sufficient to afford petitioners the protection of the Fifth Amendment, and when--in terms of pre-deprivation or post-deprivation--that process must be available.
 
 
 52
 The Secretary reviews the three elements of the balancing inquiry set forth in Mathews to conclude that "the balancing tips decidedly in favor of the government and justifies postponing review until after the Secretary's designation." Brief of the Secretary at 46. However, while we acknowledge that the factors set forth, being drawn as they are from the Supreme Court case, are necessarily the right ones, we must note that the government has made little effort to tie the factors to the question of "when" as opposed to "what" due process is to be afforded. As to the private interest, the government compares the interests asserted by petitioners in this case with that asserted in United States v. James Daniel Good Real Property, 510 U.S. 43 (1993). In that case, the Supreme Court considered "whether, in the absence of exigent circumstances, the Due Process Clause of the Fifth Amendment prohibits the government in a civil forfeiture case from seizing real property without first affording the owner notice and an opportunity to be heard." The Court expressly held "that it does." Id. at 46. The government argues from the facts of James Daniel Good Real Property that the importance of the real estate forfeited in that case dwarfs the importance of the interests of an organization in, for example, a bank account, and concludes that somehow that case supports the proposition that the interest to be protected here is not sufficiently important to warrant due process.
 
 
 53
 This strikes us as a non sequitur. The fact that the Supreme Court has held that the Fifth Amendment provides protection for a highly important property interest is at most neutral on the question of whether that Amendment provides protection to an arguably less important property interest, or even a concededly less important one. If anything, the decision would seem to weigh in favor of affording due process protection to the interest asserted by petitioners--it being a property interest as was the interest before the Supreme Court in James Daniel Good Real Property.
 
 
 54
 As to the second factor, that is, the risk of erroneous deprivation, the Secretary again offers an analysis of questionable relevance. The government reminds us that the Secretary must, under the statute, consult with the Attorney General and the Secretary of Treasury before designating a foreign terrorist organization, 8 U.S.C. 1189(c)(4), and must notify congressional leaders seven days before designating such an organization, id. 1189(a)(2)(A). While we understand the Secretary's point that more heads are likely to reach a sounder result, the application of that facially commonsensical notion to due process questions is, to put it charitably, unclear. The United States functions with a unitary executive, created in Article II of the Constitution and constrained by the Fifth Amendment from depriving anyone protected by that Amendment of life, liberty or property without due process of law. The involvement of more than one of the servants of that unitary executive in commencing a deprivation does not create an apparent substitute for the notice requirement inherent in the constitutional norm. Neither is it apparent how notice by the Article II branch of government to representatives of the Article I branch can substitute for notice to the person deprived. Again, the government has offered nothing that apparently weighs in favor of a post-deprivational as opposed to predeprivational compliance with due process requirements of the Constitution.
 
 
 55
 As to the third Mathews v. Eldridge factor--"the government's interest, including the function involved in the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," 424 U.S. at 319--the Secretary rightly reminds us that "no governmental interest is more compelling than the security of the nation." Haig v. Agee, 453 U.S. 280, 307 (1981). It is on this very point that the Secretary most clearly has failed to distinguish between the what of the Due Process Clause and the when. Certainly the United States enjoys a privilege in classified information affecting national security so strong that even a criminal defendant to whose defense such information is relevant cannot pierce that privilege absent a specific showing of materiality. United States v. Yunis, 867 F.2d 617, 623-24 (D.C. Cir. 1989) (applying the Classified Information Procedure Act, 18 U.S.C. App. 1-16 (1982)). As we will discuss further infra, that strong interest of the government clearly affects the nature--the "what" of the due process which must be afforded petitioners. It is not immediately apparent how that affects the "when" of the process--that is, whether due process may be effectively provided post-deprivation as opposed to pre-deprivation.
 
 
 56
 In support of the argument that the foreign-policy/nationalsecurity nature of the evidence supports the constitutional adequacy of a post-deprivation remedy, the Secretary offers our decision in Palestine Information Office v. Shultz, 853 F.2d 932 (D.C. Cir. 1988). The Secretary is correct that in that case, we held that where the Secretary of State had ordered the closing of an office (arguably, a foreign ministry) in this country in response to and in an attempt to curb alleged terrorist activities, the "burden on the government of requiring a hearing before the closing of [the] foreign mission" was sufficient to warrant dispensing with any otherwise available pre-deprivation hearing. Id. at 942. We did so recognizing the " 'changeable and explosive nature of contemporary international relations, and the fact that the executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature....' " Id. at 943 (quoting Zemel v. Rusk, 381 U.S. 1, 17 (1965)).
 
 
 57
 We remain committed to, and indeed bound by, that same reasoning. It is simply not the case, however, that the Secretary has shown how affording the organizations whatever due process they are due before their designation as foreign terrorist organizations and the resulting deprivation of right would interfere with the Secretary's duty to carry out foreign policy.
 
 
 58
 To oversimplify, assume the Secretary gives notice to one of the entities that:
 
 
 59
 We are considering designating you as a foreign terrorist organization, and in addition to classified information, we will be using the following summarized administrative record. You have the right to come forward with any other evidence you may have that you are not a foreign terrorist organization.
 
 
 60
 It is not immediately apparent how the foreign policy goals of the government in general and the Secretary in particular would be inherently impaired by that notice. It is particularly difficult to discern how such a notice could interfere with the Secretary's legitimate goals were it presented to an entity such as the PMOI concerning its redesignation. We recognize, as we have recognized before, that items of classified information which do not appear dangerous or perhaps even important to judges might "make all too much sense to a foreign counterintelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods." Yunis, 867 F.2d at 623. We extend that recognition to the possibility that alerting a previously undesignated organization to the impending designation as a foreign terrorist organization might work harm to this county's foreign policy goals in ways that the court would not immediately perceive. We therefore wish to make plain that we do not foreclose the possibility of the Secretary, in an appropriate case, demonstrating the necessity of withholding all notice and all opportunity to present evidence until the designation is already made. The difficulty with that in the present case is that the Secretary has made no attempt at such a showing.
 
 
 61
 We therefore hold that the Secretary must afford the limited due process available to the putative foreign terrorist organization prior to the deprivation worked by designating that entity as such with its attendant consequences, unless he can make a showing of particularized need.
 
 
 62
 c. What process is due
 
 
 63
 We have no doubt foreshadowed our conclusion as to what process the Secretary must afford by our discussion of when the Secretary must afford it. That is, consistent with the full history of due process jurisprudence, as reflected in Mathews v. Eldridge, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " 424 U.S. at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). To make plain what we have assumed above, those procedures which have been held to satisfy the Due Process Clause have "included notice of the action sought," along with the opportunity to effectively be heard. Id. at 334. This, we hold, is what the Constitution requires of the Secretary in designating organizations as foreign terrorist organizations under the statute. The Secretary must afford to the entities under consideration notice that the designation is impending. Upon an adequate showing to the court, the Secretary may provide this notice after the designation where earlier notification would impinge upon the security and other foreign policy goals of the United States.
 
 
 64
 The notice must include the action sought, but need not disclose the classified information to be presented in camera and ex parte to the court under the statute. This is within the privilege and prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect. However, the Secretary has shown no reason not to offer the designated entities notice of the administrative record which will in any event be filed publicly, at the very latest at the time of the court's review. We therefore require that as soon as the Secretary has reached a tentative determination that the designation is impending, the Secretary must provide notice of those unclassified items upon which he proposes to rely to the entity to be designated. There must then be some compliance with the hearing requirement of due process jurisprudence--that is, the opportunity to be heard at a meaningful time and in a meaningful manner recognized in Mathews, Armstrong, and a plethora of other cases. We do not suggest "that a hearing closely approximating a judicial trial is necessary." Mathews, 424 U.S. at 333. We do, however, require that the Secretary afford to entities considered for imminent designation the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations.
 
 
 65
 It is for this reason that even in those instances when postdeprivation due process is sufficient, our review under 1189(b) is not sufficient to supply the otherwise absent due process protection. The statutory judicial review is limited to the adequacy of the record before the court to support the Secretary's executive decision. That record is currently compiled by the Secretary without notice or opportunity for any meaningful hearing. We have no reason to presume that the petitioners in this particular case could have offered evidence which might have either changed the Secretary's mind or affected the adequacy of the record. However, without the due process protections which we have outlined, we cannot presume the contrary either.
 
 Remedy
 
 66
 We recognize that a strict and immediate application of the principles of law which we have set forth herein could be taken to require a revocation of the designations before us. However, we also recognize the realities of the foreign policy and national security concerns asserted by the Secretary in support of those designations. We further recognize the timeline against which all are operating: the two-year designations before us expire in October of this year. We therefore do not order the vacation of the existing designations, but rather remand the questions to the Secretary with instructions that the petitioners be afforded the opportunity to file responses to the nonclassified evidence against them, to file evidence in support of their allegations that they are not terrorist organizations, and that they be afforded an opportunity to be meaningfully heard by the Secretary upon the relevant findings.
 
 
 67
 While not within our current order, we expect that the Secretary will afford due process rights to these and other similarly situated entities in the course of future designations.
 
 Conclusion
 
 68
 For the reasons set forth above, we order that the Secretary's designation of the National Council of Resistance of Iran and the People's Mojahedin of Iran as being one foreign terrorist organization be remanded to the Secretary for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 A third petitioner, National Council of Resistance of IranUnited States ("NCRI-US") joined the brief of NCRI, fearful that because the Secretary did not distinguish between the NCRI and NCRI-US it may have been included in the designation as well. In its brief to this court, the United States agrees that NCRI-US was not so designated, and we therefore do not separately consider any claims on behalf of that entity.
 
 
 [2]
 The Council does not rely on the other requirements of 1189(b)(3).