Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued  April  2,  2004        Decided  July  9,  2004

No. 01-1480

NATIONAL COUNCIL OF RESISTANCE OF IRAN,
PETITIONER

v.

DEPARTMENT OF STATE AND
COLIN L. POWELL, SECRETARY OF STATE,
RESPONDENTS

On Petition for Review of Orders of the
Department of State

*Paul F. Enzinna* argued the cause and filed the briefs for petitioner. *Martin D. Minsker* entered an appearance.

*Douglas Letter*, Litigation Counsel, U.S. Department of Justice, argued the cause for respondents. With him on the brief was *Peter D. Keisler*, Assistant Attorney General.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: HENDERSON, GARLAND, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: This is the fourth in a series of related cases concerning the biennial designations by the Secretary of State of the Mojahedin-e Khalq Organization (MEK)[1] and its aliases as a foreign terrorist organization (FTO). *See People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999) (*PMOI I*); *National Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) (*NCRI*); *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238 (D.C. Cir. 2003) (*PMOI II*); *see generally* 8 U.S.C. § 1189. In 1999, and again in 2001, the National Council of Resistance of Iran (NCRI) was determined by the Secretary of State to be an alias of MEK and was accordingly also designated an FTO. *See* 1999 Designation, 64 Fed. Reg. at 55,112; 2001 Redesignation, 66 Fed. Reg. at 51,089. In May 2003, after a remand to cure certain due process deficiencies, *see NCRI*, 251 F.3d at 208–09, the Secretary decided to leave in place the 1999 and 2001 desig-

---

[1] The Mojahedin-e Khalq translates into English as People's Mojahedin. [AR268] The Mojahedin-e Khalq Organization (MEK) is known in English as the People's Mojahedin Organization of Iran (PMOI). Our prior decisions have variously referred to the Mojahedin-e Khalq as MEK, People's Mojahedin of Iran, and PMOI. *Compare PMOI I*, 182 F.3d at 20 ("the People's Mojahedin Organization of Iran — the MEK, for short"), *with NCRI*, 251 F.3d at 197 ("petitioner People's Mojahedin Organization of Iran ('PMOI')"). To limit confusion, wherever possible we will use the terms Mojahedin-e Khalq and MEK, and, except in case names, not the terms People's Mojahedin or PMOI. We adopt this convention because it is the Mojahedin-e Khalq Organization that the Secretary has designated as a foreign terrorist organization. *See* Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650 (Oct. 8, 1997) (1997 Designation); Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55,112 (Oct. 8, 1999) (1999 Designation); Redesignation of Foreign Terrorist Organizations, 66 Fed. Reg. 51,088, 51,089 (Oct. 5, 2001) (2001 Redesignation); Redesignation of Foreign Terrorist Organizations, 68 Fed. Reg. 56,860, 56,861 (Oct. 2, 2003) (2003 Redesignation).

nations of NCRI as an FTO. NCRI now again petitions for review. After reviewing NCRI's arguments, the entirety of the administrative record, and certain classified materials appended to that record, we conclude that the Secretary's latest designation complied with the governing statute and all constitutional requirements. We therefore deny the petition for review.

I.

The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) empowers the Secretary of State to designate an entity as an FTO whenever the Secretary determines that (1) the entity is foreign; (2) it engages in terrorist activity; and (3) the terrorist activity threatens the security of the United States or its nationals. 8 U.S.C. § 1189(a)(1). A designation as an FTO persists for two years, after which the Secretary may redesignate the entity as an FTO for a succeeding two-year period upon finding that the statutory circumstances still exist. *Id.* § 1189(a)(4)(B).

An FTO designation visits serious consequences on the affected organization: The Secretary of the Treasury may require financial institutions to freeze any assets of the FTO, *id.* § 1189(a)(2)(C); the members and representatives of the FTO become ineligible to enter the United States, *id.* § 1182(a)(3)(B)(i)(IV), (V); and anyone who knowingly provides "material support or resources" to the FTO — including any donation of money — may be prosecuted and imprisoned for up to fifteen years, 18 U.S.C. § 2339B(a)(1). The manifest purpose of these provisions is to deny terrorist organizations support — financial or otherwise — in and from the United States. *See* H.R. REP. No. 104-383, at 43–45 (1995) (House Report on AEDPA's primary predecessor bill).

Despite these serious consequences of designation, the governing statute affords suspect entities only "truncated" participation in the administrative process leading to the designation and "quite limited" judicial review after the fact. *NCRI*, 251 F.3d at 196. As we noted in *PMOI I*, "unlike the run-of-the-mill administrative proceeding," "there is [under

AEDPA] no adversary hearing, no presentation of what courts and agencies think of as evidence, [and] no advance notice to the entity affected by the Secretary's internal deliberations." 182 F.3d at 19. Once the Secretary has designated an entity an FTO, the statute directs us to "hold unlawful and set aside a designation" only if we find it to be:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right;

(D) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court [*ex parte* and *in camera*], or

(E) not in accord with the procedures required by law.

8 U.S.C. § 1189(b)(3). Although the statute permits this court to base its review either "solely upon the administrative record" "taken as a whole," or as supplemented by any classified information submitted by the Secretary, the Act makes no provision for the disclosure of that classified material to the designated entity. *See id.* § 1189(b)(2), (3)(D); *see generally* 28 C.F.R. pt. 17 (governing access to classified national security information).

In 1997, and every two years since, the Secretary has designated MEK an FTO. *See* 1997 Designation, 62 Fed. Reg. at 52,650; 1999 Designation, 64 Fed. Reg. at 55,112; 2001 Redesignation, 66 Fed. Reg. at 51,089; 2003 Redesignation, 68 Fed. Reg. at 56,861. Starting in 1999, the Secretary added NCRI to the list of designated FTOs, having concluded that NCRI was an alias of MEK. *See* 1999 Designation, 64 Fed. Reg. at 55,112 ("I hereby designate . . . the following organization as a foreign terrorist organization: . . . Mujahedin-e Khalq Organization . . . also known as National Council of Resistance, also known as NCR."). NCRI now, for the second time, seeks review of that designation. In NCRI's previous challenge — brought jointly with MEK — we con-

cluded that both the 1999 designation of MEK as an FTO and the designation of NCRI as an alias of MEK satisfied the requirements of the statute. Specifically concerning NCRI, we held — based on the record then presented to us by the Secretary — that the Secretary's conclusion that NCRI was an alias of MEK "does not lack substantial support and . . . is neither arbitrary, capricious, nor otherwise not in accordance with law." *NCRI*, 251 F.3d at 199.

As a constitutional matter, however, we determined that the procedures afforded by the statute and employed by the Secretary in arriving at those designations violated both organizations' due process rights. *See id.* at 208–09. We did not vacate the Secretary's designation as to either MEK or NCRI, but remanded to the Secretary with instructions that each entity be afforded the opportunity to: (1) respond to any part of the Secretary's administrative record that is not classified material; (2) file evidence on its own behalf; and (3) be meaningfully heard by the Secretary. *Id.* at 210.

Both MEK and NCRI availed themselves of these opportunities. NCRI submitted voluminous materials that purported to demonstrate that it was sufficiently independent of MEK that it could not be considered an alias of that organization. On September 24, 2001, the State Department informed MEK and NCRI that the Secretary had decided to leave the 1999 designation of MEK in place but that "no such determination regarding the NCRI as an alias of the MEK is possible at this time." Letter of Ambassador Francis X. Taylor, Coordinator for Counterterrorism, U.S. Dep't of State, at 2 (Sept. 24, 2001). This was shortly followed, on October 5, 2001, by the Secretary's redesignation of both MEK as an FTO and NCRI as an alias of MEK. *See* 2001 Redesignation, 66 Fed. Reg. at 51,089. At that time, the State Department assured NCRI that although "the present situation . . . requires continued designation of [NCRI] as an alias of MEK for now," upon the completion of review of NCRI's submissions, "the Secretary will make a *de novo* determination in light of the entire record, including the material you have submitted."

Letter of Ambassador Francis X. Taylor, Coordinator for Counterterrorism, U.S. Dep't of State, at 1 (Oct. 5, 2001).

Nearly a year later, the State Department provided for NCRI's review additional materials obtained by the FBI in the course of "its long-running investigation of the MEK and NCRI." Letter of Ambassador Francis X. Taylor, Coordinator for Counterterrorism, U.S. Dep't of State, at 1 (Sept. 4, 2002). Within two months, NCRI submitted its response. *See* Letter of Paul F. Enzinna, Esq. (Nov. 1, 2002). In May 2003, the State Department completed its review process and, on May 24, the Secretary decided to leave in place the 1999 and 2001 "designations of the National Council of Resistance (NCR) and the National Council of Resistance of Iran (NCRI) as foreign terrorist organization aliases of the Mujahedin-e Khalq (MEK)." Action Mem. from William Pope & William H. Taft, IV to the Secretary of State, at 3 (May 22, 2003) (Action Mem.). NCRI now petitions for review of this latest decision.

## II.

NCRI's primary argument is that the Secretary's conclusion that NCRI is an alias of MEK lacks substantial support in the administrative record. NCRI insists that it is an umbrella organization of Iranian dissident persons and groups of which MEK is only a single member, no more powerful than any other. In addressing this contention, we begin with our earlier holding in this action. In *NCRI*, we concluded — based on the record then presented to us — that the Secretary's designation of NCRI as an alias of MEK "does not lack substantial support and . . . is neither arbitrary, capricious, nor otherwise not in accordance with law." 251 F.3d at 199. Although that decision is obviously not determinative of the question before us today — we are now reviewing a record that has since been supplemented both by the Government and NCRI — its holding must nevertheless inform our decision here. Logically, NCRI's challenge can succeed only if the new record materials establish its independence from MEK so that we can no longer affirm that "the Secretary, on

the face of things, had enough information before [him] to come to the conclusion" that NCRI is an alias of MEK. *Id*. Having reviewed the supplemented administrative record as a whole and the classified information appended to it, we conclude that NCRI has not met this burden.

To explain our decision, we must first review what it means — in the very particular context of AEDPA — for one organization to be an alias of another. On its previous appeal, NCRI argued that the Secretary lacked authority under AEDPA to designate an entity an FTO based on a finding that it was an alias of another designated FTO. *See id.* at 200. We rejected that contention, finding that the grant of authority to designate FTOs "implies the authority to so designate an entity that commits the necessary terrorist acts under some other name." *Id.* In so doing, we used a mathematics metaphor — specifically, the transitive property — to describe the alias concept: "Logically, indeed mathematically, if A equals B and B equals C, it follows that A equals C. If the NCRI is the [MEK], and if the [MEK] is a foreign terrorist organization, then the NCRI is a foreign terrorist organization also." *Id.*; *see also id.* ("If the Secretary has the power to work those dire consequences on an entity calling itself 'Organization A,' the Secretary must be able to work the same consequences on the same entity while it calls itself 'Organization B.'"). Seizing upon our earlier invocation of the transitive property, NCRI now argues that the administrative record does not demonstrate that "A equals B" — that is, that NCRI equals MEK — and therefore NCRI cannot be an alias of MEK. Indeed, NCRI rightly points out that even the State Department acknowledges that NCRI and MEK are not "one and the same." *See* Pet. Reply Br. 4–6.

Implicit in NCRI's argument, however, is a mistaken assumption that the alias concept, under AEDPA, is bounded by the transitive property. This reads too much into our mathematical metaphor in *NCRI*. *See Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 94 (1926) (Cardozo, J.) ("Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it."). While it is

certainly correct to use the term alias to describe scenarios where a single entity is known by more than one name — for instance, Mojahedin-e Khalq is an alias for People's Mojahedin, two names for the same organization, one Farsi, the other English — nothing in AEDPA or any more general rule of logic or language requires that the application of the alias concept be strictly limited to such circumstances.

To the contrary, our citation in *NCRI* to *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983), indicates that we intended the alias concept to have a sweep beyond the transitive. In that case, which concerned a suit brought by Banco Para El Comercio Exterior (BPECE) against First National City Bank for performance under a letter of credit, the Supreme Court held that First National could counterclaim for setoff of the value of its assets that had been seized and nationalized by the Cuban government, notwithstanding the fact that BPECE had been established by the Cuban government as a juridical entity separate from the government. *See id.* at 623–34. Acknowledging a presumption that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," *id.* at 626–27, the Court nevertheless concluded that the normally separate juridical status had to be set aside where the Cuban government was the real party in interest behind BPECE's letter of credit claim, *id.* at 632. The Court, in reaching its conclusion, looked to ordinary principles of agency law, noting that "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other." *Id.* at 629 (citing *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402–04 (1960)). We think those same ordinary principles of agency law are fairly encompassed by the alias concept under AEDPA. When one entity so dominates and controls another that they must be considered principal and agent, it is appropriate, under AEDPA, to look past their separate juridical identities and to treat them as aliases.

The inclusion of these fundamental precepts of agency law within AEDPA's alias concept is entirely consistent with —

indeed, necessary to — the effective pursuit of the statute's objective of denying support in and from the United States to terrorist organizations. Just as it is silly to suppose "that Congress empowered the Secretary to designate a terrorist organization . . . only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have enjoyed had it never been designated," *NCRI*, 251 F.3d at 200, so too it is implausible to think that Congress permitted the Secretary to designate an FTO to cut off its support in and from the United States, but did not authorize the Secretary to prevent that FTO from marshaling all the same support via juridically separate agents subject to its control. For instance, under NCRI's conception, the Government could designate XYZ organization as an FTO in an effort to block United States support to that organization, but could not, without a separate FTO designation, ban the transfer of material support to XYZ's fundraising affiliate, FTO Fundraiser, Inc. The crabbed view of alias status advanced by NCRI is at war not only with the antiterrorism objective of AEDPA, but common sense as well.

We need not plumb all the complexities of agency law to determine when an agent, under AEDPA, is the alias of its principal. It is sufficient for our purposes to note that the requisite relationship for alias status is established at least when one organization so dominates and controls another that the latter can no longer be considered meaningfully independent from the former. *See, e.g.*, *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 403 (1960) (" 'Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent.' ") (quoting *Berkey*, 244 N.Y. at 95); *Casino Ready Mix, Inc. v. NLRB*, 321 F.3d 1190, 1196 (D.C. Cir. 2003) (" 'agent' is one who agrees to act 'subject to [a principal's] control' ") (quoting RESTATEMENT (SECOND) OF AGENCY § 1, cmt. a (1958)); *cf. Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000) ("A sovereign is amenable to suit based upon the actions of an instrumentality it dominates because the sovereign and the instrumentality

are in those circumstances not meaningfully distinct entities; they act as one.").

We thus frame our inquiry here as whether "the Secretary, on the face of things, had enough information before [him] to come to the conclusion" that NCRI was dominated and controlled by MEK. *PMOI I*, 182 F.3d at 25. Based on our review of the entire administrative record and the classified materials appended thereto, we find that the Secretary did have an adequate basis for his conclusion. While our determination is buttressed by classified information provided to us on an *ex parte* and *in camera* basis — the contents of which we cannot discuss — the voluminous unclassified materials contained in the administrative record by themselves and by a comfortable margin provide sufficient support for the Secretary's conclusion, given the standard of review. It would serve little purpose to catalogue all the material in the administrative record supporting the conclusion that NCRI is dominated and controlled by MEK, but we will set out below a few of the pieces of information we found to be most compelling. As we do so, it bears repeating that AEDPA does not permit us, in exercising our limited judicial review, to make any "judgment whatsoever regarding whether the material before the Secretary is or is not true," but allows us to inquire only whether the Secretary "had enough information before [him] to come to the conclusion" that NCRI is dominated and controlled by MEK. *Id.*

After an extensive investigation of MEK and NCRI, the FBI reported to the State Department that "[i]t is the unanimous view of the FBI personnel who are involved in and familiar with the FBI's investigation of the [MEK] that the NCRI is not a separate organization, but is instead, and has been, an integral part of the MEK at all relevant times." Letter of Charles Frahm, Section Chief, International Terrorism Operations Section II, at 1 (Aug. 28, 2002). Contrary to NCRI's portrayal of itself as an umbrella organization, of which the MEK was just one member, the FBI concluded that it is NCRI that is "the political branch" of the MEK. *Id.* Attach. at 1.

This conclusion was based in large part on evidence gathered from the search — executed in December 2001 pursuant to a valid warrant — of a house in Falls Church, Virginia apparently used as office space by both NCRI and MEK. There, the FBI discovered NCRI and MEK materials "commingled together, and not separated," including bank records, signed blank checks, MEK propaganda, NCRI publications, travel documents, and letterhead which listed the same French address for each organization. *Id.* Attach. at 2–4. Crucially, among the recovered documents was a schematic breakdown of the "Iranian Resistance," which described NCRI as "The Political Branch" of the movement. *Id.* at Tab 6.

Additionally, earlier investigations of MEK and NCRI had revealed that the two organizations shared an essentially unitary leadership structure. The overall head of MEK, Massoud Rajavi, also leads NCRI. And Rajavi's wife, Maryam Rajavi, was selected by NCRI to be Iran's President-in-Exile. *Id.* Attach. at 2; *see also id.* Attach. at 4 ("The leadership of [MEK] and NCRI is intermixed, and the entities operate in a day-to-day way as a single unit."). These facts corroborated the FBI's earlier conclusion prior to the 2001 designation of NCRI as an FTO that "the NCR/NCRI is in fact controlled by and inseparable from the MEK." Decl. of Agent Michael Rolince (quoted in Action Mem., Tab 2 at 11).

The State Department acknowledged that "NCRI has submitted numerous affidavits purporting to show that it is not controlled by the MEK and is not an MEK front," and even credited some of NCRI's "subsidiary points." Action Mem., Tab 2 at 12, 9. The agency, however, concluded that "the evidence developed by the FBI is convincingly to the contrary." *Id.* Tab 2 at 12. It may be true that the State Department relied very heavily on the conclusions of the counterterrorism experts of the FBI. As noted above, though, under the narrow powers of judicial review Congress has accorded to us under AEDPA, it is emphatically not our province to second-guess the Secretary's judgment as to which affidavits to credit and upon whose conclusions to rely.

We are to judge only whether the "support" marshaled for the Secretary's designation was "substantial." 8 U.S.C. § 1189(b)(3)(D). We conclude that the support for the Secretary's conclusion that NCRI was dominated and controlled by, and thus was an alias of, MEK was indeed substantial, and we therefore reject NCRI's statutory challenge to its designation as an FTO.

### III.

This leaves only NCRI's constitutional challenges to certain procedures employed in making that designation. Specifically, NCRI argues that due process requires that (1) it be provided access to any classified materials that the Secretary relied upon in making the designation, and (2) it have an adversary hearing before the agency at which it could confront witnesses against it. Both these arguments are foreclosed by our earlier decisions in *NCRI* and *PMOI II*. *See* 251 F.3d at 208–09; 327 F.3d at 1242–43. Concerning NCRI's claim that it is entitled to review classified materials, in *NCRI* we wrote that the government "need not disclose the classified information to be presented *in camera* and *ex parte* to the court under the statute." 251 F.3d at 208. In *PMOI II*, addressing the same claim, this time brought by MEK, we were even more emphatic: "We reject this contention. . . . We already decided in [*NCRI*] that due process required the disclosure of *only* the unclassified portions of the administrative record." 327 F.3d at 1242. *PMOI II* also disposes of NCRI's claim for an adversary hearing. There, we held that *NCRI* established the constitutional baseline for fair process and, the Government having complied with those commands on remand, that "nothing further is due." *Id.* at 1243. We reach the same conclusion with regard to NCRI.

The petition for review is denied.