# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 12, 2010        Decided July 16, 2010

No. 09-1059

PEOPLE'S MOJAHEDIN ORGANIZATION OF IRAN,
PETITIONER

v.

UNITED STATES DEPARTMENT OF STATE AND
HILLARY RODHAM CLINTON,
IN HER CAPACITY AS SECRETARY OF STATE,
RESPONDENTS

On Petition for Review of an Order
of the Department of State

*Andrew L. Frey* argued the cause for the petitioner. *Miriam R. Nemetz*, *Melanie W. Rughani*, *Steven M. Schneebaum*, *E. Barrett Prettyman Jr.* and *Joshua D. Hawley* were on brief. *Ronald G. Precup* entered an appearance.

*Paul B. Stephan III* was on brief for *amici curiae* the Honorable Alejo Vidal-Quadras et al. in support of the petitioner.

*James C. Martin* and *W. Thomas McGough Jr.* were on brief for *amici curiae* Colonel Gary L. Morsch, M.D. et al. in support of the petitioner.

*Lawrence S. Robbins* and *Alan E. Untereiner* were on brief for *amici curiae* Iranian-American Society of Texas et al. in support of the petitioner.

*Viet D. Dinh* and *Nathan A. Sales* were on brief for *amici curiae* Members of Congress in support of the petitioner.

*Douglas Letter*, Attorney, United States Department of Justice, argued the cause for the respondents. *Ileana M. Ciobanu*, Attorney, was on brief.

Before: HENDERSON and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* HENDERSON.

PER CURIAM: This case is the fifth in a series of related actions challenging the United States Secretary of State's designation of the Mojahedin-e Khalq Organization (MEK) and its aliases as a Foreign Terrorist Organization (FTO). The MEK, also called the People's Mojahedin Organization of Iran (PMOI),[1] has challenged its FTO status before this court three times. *See People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 18-19 (D.C. Cir. 1999) (*PMOI I*); *Nat'l Council of Resistance of Iran v. Dep't of State,* 251 F.3d 192, 195-96 (D.C. Cir. 2001) (*NCRI I*); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 327 F.3d 1238, 1239 (D.C. Cir. 2003) (*PMOI II*). The National Council of Resistance of Iran (NCRI), which the United States Department of State (State) considers an alias or alter ego of the PMOI, has challenged its FTO status twice—once with the PMOI and once on its own. *See NCRI I*, 251 F.3d at 197; *Nat'l Council of Resistance of Iran*

---

[1]Because the petitioner in this case is the People's Mojahedin Organization of Iran, or the PMOI, we refer to the MEK and all associated aliases as the PMOI.

*v. Dep't of State*, 373 F.3d 152, 154 (D.C. Cir. 2004) (*NCRI II*). In *NCRI I*, the court remanded the petition to the Secretary to provide certain due process protections to the PMOI and the NCRI. *See* 251 F.3d at 209. In the other three cases, including both petitions for review following remand in *NCRI I*, the court denied the petitioners' challenges.

On July 15, 2008, citing a change in its circumstances, the PMOI petitioned State and its Secretary for revocation of the PMOI's FTO designation. After assembling a record comprised of materials submitted by both the PMOI and the U.S. intelligence community, including classified information, the Secretary rejected the PMOI's petition on January 12, 2009. *See* In the Matter of the Review of the Designation of Mujahedin-e Khalq Organization (MEK), and All Designated Aliases, as a Foreign Terrorist Organization, 74 Fed. Reg. 1273, 1273-74 (Jan. 12, 2009). The PMOI now seeks review of the Secretary's decision. We conclude that the Secretary failed to accord the PMOI the due process protections outlined in our previous decisions and therefore remand.

**I.**

Although our earlier decisions detail the statutory scheme and the PMOI's prior designations, we briefly review them again together with the events leading to this action.

**A.**

We begin by describing the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which was amended as part of the Intelligence Reform and Terrorist Prevention Act of 2004, Pub. L. No. 108-458, § 7119, 118 Stat. 3638, 3801 (2004). Under AEDPA, the Secretary may designate an entity as an FTO if she determines that (A) the entity is foreign, (B) it engages in "terrorist activity" or "terrorism" and (C) the terrorist activity threatens the security of the United States or its nationals. 8 U.S.C. § 1189(a)(1). "Terrorist activity" is defined in section

1182(a)(3)(B)(iii) and includes hijacking, sabotage, kidnapping, assassination and the use of explosives, firearms, or biological, chemical or nuclear weapons with intent to endanger people or property, or a threat or conspiracy to do any of the foregoing. To "engage in terrorist activity" involves, among other acts, soliciting funds or affording material support for terrorist activities, *id.* § 1182(a)(3)(B)(iv), while "terrorism" means "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents," 22 U.S.C. § 2656f(d)(2).

The FTO designation has at least three consequences: the Secretary of the United States Treasury Department may freeze the FTO's assets, 8 U.S.C. § 1189(a)(2)(C); FTO members are barred from entering the United States, *id.* § 1182(a)(3)(B)(i)(IV), (V); and those who knowingly provide "material support or resources" to an FTO are subject to criminal prosecution, 18 U.S.C. § 2339B(a)(1). *See Kahane Chai v. Dep't of State*, 466 F.3d 125, 127 (D.C. Cir. 2006); *NCRI II*, 373 F.3d at 154. A designated organization can attempt to avoid these consequences by seeking review in this court no later than thirty days after publication in the Federal Register of the Secretary's designation, amended designation or determination in response to a petition for revocation. *See* 8 U.S.C. § 1189(c)(1). Our review is based "solely upon the administrative record, except that the Government may submit, for ex parte and in camera review, classified information" that the Secretary used to reach her decision. *Id.* § 1189(c)(2). The review "sounds like the familiar procedure normally employed by the Congress to afford due process in administrative proceedings" and is "reminiscent of other administrative review." *NCRI I*, 251 F.3d at 196-97. Employing "APA-like language," *PMOI I*, 182 F.3d at 22, the statute requires that we "hold unlawful and set aside a designation, amended designation, or determination in response to a petition for revocation" that we find:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right;

(D) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under paragraph (2), or

(E) not in accord with the procedures required by law.

8 U.S.C. § 1189(c)(3). This standard of review applies only to the first and second requirements, namely, (1) that the organization is foreign and (2) that it engages in terrorism or terrorist activity or retains the capability and intent to do so. We have held that the third requirement—that the organization's activities threaten U.S. nationals or national security—presents an unreviewable political question. *PMOI I*, 182 F.3d at 23.

**B.**

As originally enacted, AEDPA permitted an FTO designation to remain in effect for only two years, which required the Secretary at the end of that time period to either compile a new administrative record and renew the designation or allow it to lapse. *See* 8 U.S.C. § 1189(a)(4)(A)-(B) (2003). Her determination was subject to review in this court. *Id.* § 1189(b) (2003). The Secretary first designated the PMOI as an FTO under AEDPA in 1997 and made successive designations in 1999, 2001 and 2003. *See* Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650 (Oct. 8, 1997) (1997 Designation); Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55,112 (Oct. 8, 1999) (1999 Designation); Redesignation of Foreign Terrorist Organizations, 66 Fed. Reg. 51,088, 51,089 (Oct. 5, 2001) (2001

Redesignation); Redesignation of Foreign Terrorist Organizations, 68 Fed. Reg. 56,860, 56,861 (Oct. 2, 2003) (2003 Redesignation). In *PMOI I*, we denied the PMOI's petition for review of the initial 1997 Designation. 182 F.3d at 25. In her 1999 redesignation, the Secretary coupled the PMOI with the NCRI, which the Secretary considered the PMOI's alter ego or alias. *See* 1999 Designation. On review, we held that the Secretary had substantial support to so conclude but we remanded after concluding that the PMOI and the NCRI had been denied due process. *See NCRI I*, 251 F.3d at 209.

On remand, the Secretary allowed the PMOI and the NCRI to respond to the unclassified portions of the Secretary's administrative record and also to supplement it. After reviewing the record so comprised, the Secretary re-entered the 1999 Designation as to the PMOI on September 24, 2001, *see* Letter of Ambassador Francis X. Taylor, Coordinator for Counterterrorism, U.S. Dep't of State, at 2 (Sept. 24, 2001), and began a new two-year designation the following month as to both the PMOI and the NCRI, *see* 2001 Redesignation. We denied the PMOI's petition for review. *See PMOI II*, 327 F.3d at 1245. The Secretary's 2001 Redesignation also concluded that the NCRI was the PMOI's alter ego and was thus also properly designated an FTO. At the same time, State assured the NCRI that it would make a *de novo* determination of its FTO designation after completing a review of the materials the NCRI had submitted to the Secretary. *See NCRI II*, 373 F.3d at 155 (citing Letter of Ambassador Francis X. Taylor, Coordinator for Counterterrorism, U.S. Dep't of State, at 1 (Oct. 5, 2001)). In May 2003, the Secretary left in place the 1999 Designation and 2001 Redesignation of the NCRI as an alias of the PMOI and an FTO and, on review, we upheld the Secretary's decision. *See NCRI II*, 373 F.3d at 154 (denying petition for review because "the Secretary's latest designation complied with the governing statute and all constitutional requirements"). Before our

decision issued, the Secretary had already redesignated the PMOI again in October 2003.[2] *See* 2003 Redesignation.

Shortly after *NCRI II*, and while the 2003 Redesignation of the PMOI was still in effect, the Congress lessened the Secretary's administrative burden by amending AEDPA to remove the two-year limitation on an FTO designation. *See* Intelligence Reform and Terrorist Prevention Act of 2004 § 7119. A designation no longer lapses. Instead, a designated organization may seek revocation two years after the designation is made or, if the designated organization has previously filed a petition for revocation, two years after that petition is resolved. 8 U.S.C. § 1189(a)(4)(B)(ii). To seek revocation, an FTO "must provide evidence in that petition that the relevant circumstances . . . are sufficiently different from the circumstances that were the basis for the designation such that a revocation with respect to the organization is warranted." *Id.* § 1189(a)(4)(B)(iii). The Secretary has 180 days from the date of the petition to make her revocation decision. *Id.* § 1189(a)(4)(B)(iv)(I). In making her decision, the Secretary may rely on classified information, which "shall not be subject to disclosure for such time as it remains classified, except that such information may be disclosed to a court ex parte and in camera for purposes of judicial review." *Id.* § 1189(a)(4)(B)(iv)(II). If five years elapse without a petition for revocation from the FTO, the Secretary

---

[2]The Secretary designated the Mujahedin-e Khalq Organization, along with the following aliases: Mujahedin-e Khalq; MEK; MKO; People's Mujahedin Organization of Iran (including its U.S. office and all other offices worldwide); PMOI; Organization of the People's Holy Warriors of Iran; Sazeman-e Mujahedin-e Khalq-e Iran; National Council of Resistance (including its U.S. office and all other offices worldwide); NCR; National Council of Resistance of Iran (including its U.S. office and all other offices worldwide); NCRI; National Liberation Army of Iran; NLA; and the Muslim Iranian Student's Society. 2003 Redesignation.

conducts her own review to determine if revocation is appropriate. *Id.* § 1189(a)(4)(C)(i). Unlike a determination made in response to a petition for revocation, her *ex mero motu* decision is not judicially reviewable. *Id.* § 1189(a)(4)(C)(ii). While the Secretary may revoke a designation at any time, *id.* § 1189(a)(6)(A), the statute directs that she *shall* revoke a designation if she finds that either "the circumstances that were the basis for the designation have changed in such a manner as to warrant revocation," or "the national security of the United States warrants a revocation," *id.*

## C.

This action began in July 2008, when the PMOI filed a petition for revocation of its 2003 Redesignation. The PMOI argued that the 2003 Redesignation should be revoked because of its dramatically changed circumstances since the Secretary's and this court's last reviews. It submitted evidence to the Secretary of its changed circumstances, asserting that, since its initial FTO designation in 1997, it had: ceased its military campaign against the Iranian regime and renounced violence in 2001; voluntarily handed over its arms to U.S. forces in Iraq and cooperated with U.S. officials at Camp Ashraf (where all of its members operating in Iraq are consolidated) in 2003; shared intelligence with the U.S. government regarding Iran's nuclear program; in 2004 obtained "protected person" status under the Fourth Geneva Convention for all PMOI members at Camp Ashraf based on the U.S. investigators' conclusions that none was a combatant or had committed a crime under any U.S. laws; disbanded its military units and disarmed the PMOI members at Ashraf, all of whom signed a document rejecting violence and terror; and obtained delisting as a terrorist organization from the United Kingdom (the Proscribed Organisations Appeal Commission and the Court of Appeal) in 2008 and from the European Union (the European Court of First Instance) in 2009. The PMOI also thrice supplemented its petition with additional

information and letters in support from members of the U.S. Congress, members of the UK and European parliaments and retired members of the U.S. military, among others.

After reviewing an administrative record consisting of both classified and unclassified information, the Secretary denied the PMOI's petition and published its denial in the Federal Register on January 12, 2009. *See* 74 Fed. Reg. at 1273-74. She also provided the PMOI with a heavily redacted 20-page administrative summary of State's review of the record, which summary referred to 33 exhibits, many of which were also heavily or entirely redacted. *See* Admin. Summ. (Jan. 8, 2009) (Unclassified Version); Revised Admin. Summ. (Apr. 24, 2009) (Unclassified Version). The Secretary's determination was based on the administrative record, "supporting exhibits and supplemental filings by the MEK in support of the Petition, as well as information from a variety of sources, including the U.S. Intelligence Community." Revised Admin. Summ. 2. She wrote that "in considering the evidence as a whole, the MEK has not shown that the relevant circumstances are sufficiently different from the circumstances that were the basis for the 2003 re-designation," and that "[a]s a consequence, the MEK continues to be a foreign organization that engages in terrorist activity . . . or terrorism . . . or retains the capability and intent to" do so. *Id.*; *see* 74 Fed. Reg. at 1273-74. Nevertheless she also noted:

> In light of the evidence submitted by the MEK that it has renounced terrorism and the uncertainty surrounding the MEK presence in Iraq, the continued designation of the MEK should be re-examined by the Secretary of State in the next two years even if the MEK does not file a petition for revocation.

Revised Admin. Summ. 20. Although the Secretary informed the PMOI of her decision the day before it was published in the Federal Register, she did not provide the organization any

unclassified material on which she intended to rely. *See* Resp'ts' Br. 20 (*after* denying revocation petition "[t]he State Department . . . provided to the PMOI an unclassified summary of the evidence in the record and the agency's analysis of the issues").

The PMOI filed a timely petition for review on February 11, 2009 under 8 U.S.C. § 1189(c). It asks us to vacate the Secretary's decision and remand with instructions to revoke its FTO designation based on a lack of substantial support in the record. Alternatively, the PMOI asks us to vacate its designation on the ground that the Secretary did not comply with the due process requirements set forth in our earlier decisions by failing to provide it with advance notice of her proposed action and the unclassified record on which she intended to rely, as well as by failing to provide it with any access to the classified record.

State submitted its classified administrative record on March 30, 2009 for ex parte and in camera review under 8 U.S.C. § 1189(c)(2); it subsequently filed a redacted, unclassified version in August 2009. In filing the latter document, State noted that it intended to file additional documents as soon as its declassification review was finished. It later supplemented the record with newly declassified material twice—once on September 8, 2009, the day the PMOI's opening brief was due, and again on October 27, 2009, about two weeks before the PMOI's reply brief due date.[3]

---

[3]Among the disclosures in the declassified material: "the MEK trained females at Camp Ashraf in Iraq to perform suicide attacks in Karbala"; "the MEK solicits money under the false pretext of humanitarian aid to the Iranian population"; "an August 2008 U.S. Intelligence Community Terrorist Threat Assessment, clearly states that the MEK retains a limited capability to engage in terrorist activity or terrorism"; "[t]he MEK publicly renounced violence in 2001, but

11

**II.**

Ordinarily, we would be required to decide whether to set aside the Secretary's denial of the PMOI's revocation petition on the ground that her conclusion that the PMOI "engages in terrorist activity . . . or terrorism . . . or retains the capability and intent to engage in terrorist activity or terrorism," Revised Admin. Summ.   2-3, "lack[s] substantial support in the administrative record taken as a whole or in classified information submitted to the court."  8 U.S.C. § 1189(c)(3)(D).

Here, however, we need not determine the adequacy of the record because, as the PMOI argues, our review "is not sufficient to supply the otherwise absent due process protection" of notice to the designated organization and an opportunity for a meaningful hearing. *NCRI I*, 251 F.3d at 208 (designated organization entitled to "opportunity to be heard 'at a meaningful time and in a meaningful manner'" (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976))).  In other words, even were we to agree with State that the record is sufficient, we cannot uphold the designation absent the procedural safeguards required by our precedent.  Specifically, our cases require the Secretary to notify the PMOI of the unclassified material "upon which [s]he propose[d] to rely" and to allow the PMOI "the opportunity to present, at least in written

limited intelligence reporting indicates that the group has not ended military operations, repudiated violence, or completely or voluntarily disarmed"; "[t]he [intelligence community] assesses that although there has not been a confirmed terrorist attack by the MEK since the organization surrendered to Coalition Forces in 2003, the MEK retains a limited capability and the intent to use violence to achieve its political goals"; and "UN inspectors say that much of the information provided to the UN by the MEK about Iran's nuclear program has a political purpose and has been wrong."  Suppl. Admin. R. (filed Oct. 27, 2009).

form, such evidence as [it] may be able to produce to rebut the administrative record or otherwise negate the proposition that" it is an FTO. *NCRI I*, 251 F.3d at 209.

This did not happen here. The PMOI was notified of the Secretary's decision and permitted access to the unclassified portion of the record only *after* the decision was final.[4] And even though the PMOI was given the opportunity to include in the record its own evidence supporting delisting, it had no opportunity to rebut the unclassified portion of the record the Secretary was compiling—an omission, the PMOI argues, that deprived it of the due process protections detailed in our previous decisions. *See* Pet'r's Br. 23 ("[T]he Secretary's decision is procedurally infirm because PMOI was given no opportunity to rebut the administrative record . . . .").

State does not deny that the Secretary failed to provide the type of notice specified in *NCRI I*. But it argues that she complied with our precedent well enough in light of the statutory scheme as altered by the 2004 AEDPA amendments and the "flexible" nature of due process. Arg. Tr. 22:18-21; *see NCRI I,* 251 F.3d at 205 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Within that framework, State argues, the Secretary provided the PMOI with all of the process constitutionally due by informally meeting with the PMOI in October 2008 (at the PMOI's request), by allowing the PMOI to supplement the administrative record with evidence of its own and by sharing unclassified material with the PMOI (but not before her denial of the revocation petition). *See* Resp'ts' Br. 18, 44-45 (citing *PMOI II*, 327 F.3d at 1242; *NCRI I*, 251 F.3d

---

[4]Although we do not require advance notification of the Secretary's decision upon an adequate showing that "earlier notification would impinge upon the security and other foreign policy goals of the United States," *NCRI I*, 251 F.3d at 208, State does not suggest the Secretary had this concern.

at 208-09) (PMOI received "notice along with the opportunity to be effectively heard" and "nothing more is required by this Court"). State also urges that, even if the Secretary should have turned over the unclassified portion of the record before its January 2009 decision, her failure to do so was harmless.

We disagree on both counts. Nothing in the 2004 amendments provides a basis for relaxing the due process requirements we outlined for the redesignation decision at issue in *NCRI I.* Although phrased slightly differently, the Secretary's fundamental inquiry is the same for both redesignation under the old statute and revocation under the new. *Compare* 8 U.S.C. § 1189(a)(4)(B) (2003) (redesignation appropriate if "relevant circumstances" initially warranting designation "still exist") *with id.* § 1189(a)(6) (revocation appropriate if "circumstances that were the basis for the designation have changed in such a manner as to warrant revocation"). So, too, is our standard of review the same under both versions of the statute whether we review a "designation," a "redesignation" or a "petition for revocation." *See id.* § 1189(c)(3). And while the amended version of the statute puts the burden on an FTO to "provide evidence" of changed circumstances, *see id.* § 1189(a)(4)(B)(iii), the Secretary must still compile a record supporting the continued designation, *see id.* § 1189(a)(6)(B). In short, we have held due process requires that the PMOI be notified of the unclassified material on which the Secretary proposes to rely and an opportunity to respond to that material *before* its redesignation; nothing in the amended statute suggests that this protection is any less necessary in the revocation context.[5]

---

[5]At oral argument, State noted that, unlike the procedure originally set forth in AEDPA, whereby the Secretary compiled a new administrative record on a biennial basis, today no record is compiled until the FTO files a petition for revocation. *See* Arg. Tr. 29-30. This leaves the Secretary only 180 days from that filing to contact multiple defense and intelligence agencies, compile the administrative record

Nor do we find the Secretary's failure to provide the required notice and unclassified material in advance of her decision harmless because the information at the "heart" of the Secretary's decision is classified and could not have been shared in any event. Resp'ts' Br. 45-46. State's characterization notwithstanding, at argument it acknowledged that the Secretary's decision was based not on "just the classified information" but rather "on the record as a whole." Arg. Tr. 31:24-32:1-7; *see* Suppl. Admin. R. 19 ("In considering the body of evidence as a whole, intelligence and national security experts conclude that the MEK has not demonstrated that the circumstances that were the basis for the original designation have changed in such a manner as to warrant revocation."). Hence, State asks us to assume that nothing the PMOI would have offered—not even evidence refuting whatever *unclassified* material the Secretary may have relied on—could have changed her mind. We explicitly rejected this argument in *NCRI I*. *See* 251 F.3d at 209 ("We have no reason to presume that the petitioners in this particular case could have offered evidence which might have either changed the Secretary's mind or affected the adequacy of the record[, but] . . . without the due process protections which we have outlined, we cannot presume the contrary either."). Far from *assuming* that the classified record obviated further review, we held that our limited role "is not sufficient to supply the otherwise absent due process protection." *Id.* at 209.[6]

_____

and make a determination—and thus inadequate opportunity to complete the "extremely difficult and time consuming process" of providing declassified portions of the record in advance of her decision. *Id.* 25:20-21. Time constraints, however, cannot override constitutional constraints.

[6] In *NCRI I,* by declining to assume that the PMOI could not have changed the Secretary's mind in the absence of due process

15

To illustrate, during the briefing in this case, the Secretary twice supplemented the unclassified record with formerly classified materials. These disclosures include the statement that PMOI members planned suicide attacks in Karbala. Because it learned of this information only after it petitioned for judicial review, the PMOI attempts to distinguish and discredit it for the first time before us. *See* Pet'r's Reply Br. 21 (calling allegations "so manifestly implausible that they earned no mention in the Government's brief"). Citing *PMOI I*, 182 F.3d at 19, 25, State argues that the Secretary may consider "sources named and unnamed, the accuracy of which we have no way of evaluating," and that we cannot make any "judgment whatsoever regarding whether the material before the Secretary is or is not true." Nevertheless, to the extent we defer to the Secretary's fact-finding process, we have done so with the understanding that the Secretary has adhered to the procedural safeguards of the due process clause, *see NCRI I*, 251 F.3d at 209, and afforded the designated organization a fair opportunity to respond to the unclassified record.

At oral argument, State suggested that the PMOI, now in possession of the unclassified portions of the record (including the newly declassified material), may go back to the Secretary

protections, we cast doubt on whether any denial could be found harmless, perhaps because a convincing response by the FTO to the unclassified material might affect the Secretary's view not only of that evidence but of the classified material as well. *See* 251 F.3d at 209. In other words, because of the due process denial, we declined to consider whether the record nevertheless substantially supported the Secretary's determination. And while it is true that we held a similar due process denial harmless in *Kahane Chai*, we did so only because the government, in response to the petitioners' objections, "offered to do and in 2004 did a *de novo* determination of their status" with the attendant "opportunity to inspect and to supplement the record upon which the review would be based." 466 F.3d at 132.

and provide evidence to rebut it. *See* Arg. Tr. 26:19-20. We think a better approach is the one the then-Secretary took after remand in *NCRI I*, when, apparently faced with a similar time crunch, he made a designation that was to be reevaluated once he fully reviewed the supplemented record. *See NCRI II*, 373 F.3d at 155 ("At that time, the State Department assured NCRI that although 'the present situation . . . requires continued designation of [NCRI] as an alias of MEK for now,' upon the completion of review of NCRI's submissions, 'the Secretary will make a *de novo* determination in light of the entire record, including the material you have submitted.'" (quoting Letter of Ambassador Francis X. Taylor, Coordinator for Counterterrorism, U.S. Dep't of State, at 1 (Oct. 5, 2001))).

Our reluctance to accept State's "no harm, no foul" theory is greater in light of the fact that we are unsure what material the Secretary in fact relied on or to what portion of 8 U.S.C. § 1189(a)(1)(B) she found it relevant. While "it is emphatically not our province to second-guess the Secretary's judgment as to which affidavits to credit and upon whose conclusions to rely," the Congress has required us to determine "whether the 'support' marshaled for the Secretary's designation was 'substantial.'" *NCRI II*, 373 F.3d at 159 (quoting 8 U.S.C. § 1889A(b)(3)(D)). Some of the reports included in the Secretary's analysis on their face express reservations about the accuracy of the information contained therein. *See, e.g.*, Suppl. Admin. R., MEK-11 (describing "possible plans to attack [the] international zone in Baghdad" but conceding that "the ultimate sources of the information was [sic] unknown and as such, their access, veracity, and motivations were unknown"). Similarly, while including reports about the Karbala suicide attack plot described above, the Secretary did not indicate whether she accepted or discredited the reports and we do not know whether the PMOI can rebut the reports.

In other instances, the Secretary cited a source that it seemed to regard as credible but did not indicate to what part of the statute the source's information was relevant. For example, her analysis described a federal grand jury indictment alleging that MEK has engaged in fraud in fundraising operations and she faulted the PMOI for failing to discuss its finances in its submission to the Secretary. Suppl. Admin. R. 11. It is unclear, however, whether the Secretary believes that fundraising under false pretenses is direct evidence of terrorist activity or instead bears on the PMOI's "capability" to engage in terrorist activity in the future or its "intent" to do so. 8 U.S.C. § 1189(a)(1)(B). While we will not substitute our judgement for that of the Secretary in deciding which sources are credible, we must determine whether the record before her provides "a sufficient basis for a reasonable person to conclude" that the statutory requirements have been met. *Kahane Chai*, 466 F.3d at 129 (citing *PMOI I*, 182 F.3d at 25). Without knowing whether, or how, the Secretary evaluated the record material, we are unable to do so.

**III.**

As we noted in *NCRI I,* "[w]e recognize that a strict and immediate application of the principles of law which we have set forth herein could be taken to require a revocation of the designation[] before us[, but] . . . we also recognize the realities of the foreign policy and national security concerns asserted by the Secretary in support of th[e] designation." 251 F.3d at 209. We thus leave the designation in place but remand with instructions to the Secretary to provide the PMOI the opportunity to review and rebut the unclassified portions of the record on which she relied. In so doing, we emphasize two things:

First, as earlier explained, the Secretary should indicate in her administrative summary which sources she regards as sufficiently credible that she relies on them; and she should

explain to which part of section 1189(a)(1)(B) the information she relies on relates. Second, although the Secretary must give the PMOI an opportunity to rebut the unclassified material on which she relies,[7] AEDPA does not allow access to the classified record as it makes clear that classified material "shall not be subject to disclosure for such time as it remains classified, except that such information may be disclosed to a court ex parte and in camera for purposes of judicial review." 8 U.S.C. § 1189(a)(4)(B)(iv)(II); *see id.* § 1189(c)(2) (providing for court's "ex parte and in camera review" of "classified information used in making the designation"). Our cases under AEDPA have suggested that this procedure can satisfy due process requirements, at least where the Secretary has not relied critically on classified material and the unclassified material provided to the FTO is sufficient to justify the designation. *See NCRI II,* 373 F.3d at 159-60; *PMOI II*, 327 F.3d at 1243 ("We already decided in [*NCRI I*] that due process required the disclosure of *only* the unclassified portions of the administrative record.") (emphasis in original); *NCRI I*, 251 F.3d at 202, 208-09 ("We acknowledge that in reviewing the whole record, we have included the classified material[, but] . . . we will not and cannot disclose the contents of the record," which "is within the privilege and prerogative of the executive"); *see also Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1182, 1184 (D.C. Cir. 2004) (pilot denied licensure has no right to access to classified record because "[t]he due process protections afforded . . . parallel those provided under similar circumstances in [*NCRI I* and *PMOI II*], and are sufficient to satisfy our case law"); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164

---

[7]State agrees that "only legitimately classified information should be redacted from the public version of the Administrative Record" and thus has reviewed and disclosed all material that it believes can be safely declassified consistent with national security interests. Resp'ts' Br. 41.

(D.C. Cir. 2003) ("HLF's complaint, like that of the Designated Foreign Terrorists Organizations in [*NCRI I* and *PMOI II*], that due process prevents its designation [under a different law] based upon classified information to which it has not had access is of no avail."). We note, however, that none of the AEDPA cases decides whether an administrative decision relying critically on undisclosed classified material would comport with due process because in none was the classified record essential to uphold an FTO designation. But they do indicate that, for the purpose of today's remand, affording PMOI an opportunity to review and rebut the unclassified portions of the record, coupled with the Secretary's assurance that she has evaluated the material—and the sources therefor—that she relied on to make her decision, may be sufficient to provide the requisite due process.

For the reasons set forth above, the Secretary's denial of the People's Mojahedin of Iran's petition for revocation of its 2003 designation as a foreign terrorist organization is remanded to the Secretary for further proceedings consistent with this opinion.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring:

We are to uphold the Secretary's determination unless it "lack[s] substantial support in the administrative record taken as a whole *or in classified information submitted to the court.*" 8 U.S.C. § 1189(c)(3)(D) (emphasis added). In my view, the classified portion of the administrative record provides "substantial support" for her determination that the PMOI either continues to engage in terrorism or terrorist activity or retains the capability and intent to do so and, consequently, for her denial of the PMOI's revocation petition. Further, our cases have repeatedly emphasized what the statute makes clear: the PMOI enjoys no right to access classified material the Secretary relied on. *See NCRI I*, 251 F.3d at 208 (state's notice to designated entities "need not disclose the classified information to be presented *in camera* and *ex parte* to the court under the statute"); *see also PMOI II*, 327 F.3d at 1242 (we "already decided in [*NCRI I*] that due process required the disclosure of *only* the unclassified portions") (emphasis in original). And we have upheld against due process challenge an AEDPA designation that relied on *both* classified and unclassified material. *See NCRI II,* 373 F.3d at 152 ("*Based on our review of the entire administrative record and the classified materials appended thereto,* we find that the Secretary did have an adequate basis for his conclusion.") (emphasis added). Although we acknowledged later in the same opinion that the unclassified record alone would have sufficed to support the designation, we have consistently and unambiguously followed this reading of *NCRI I* in virtually every AEDPA case.[1] *See id.*

---

[1]For example, in *PMOI II* we rejected the contention that the PMOI's redesignation under AEDPA was unconstitutional because "the Secretary relied on secret information to which [the PMOI was] not afforded access": "We have already established in [*NCRI I*] the process which is due under the circumstances of this sensitive matter of classified intelligence in the effort to combat foreign terrorism. The Secretary has complied with the standard we set forth therein, and nothing further is due." *PMOI II*, 327 F.3d at 1242-43. The court

at 159-60 (access argument is "foreclosed by our earlier decisions in [*NCRI I*] and *PMOI II*"); *cf. Kahane Chai v. Dep't of State*, 466 F.3d 125, 129 (D.C. Cir. 2006) (declining to resolve due process claim because "we can uphold the designations based solely upon the unclassified portion of the administrative record"). Moreover, other precedent also affirms administrative decisions relying on classified material, each rejecting a due process challenge on the basis of *PMOI II* and *NCRI I*.[2] While these decisions are not under AEDPA, they treat

---

went on to note that "even if we err in describing the process due, even had the Petitioner been entitled to have its counsel or itself view the classified information, the breach of that entitlement has caused it no harm." *Id.* at 1243. But I read the subjunctive phrase beginning with "even if" as an alternative holding which means *both* holdings constitute precedent. *See Natural Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n*, 216 F.3d 1180, 1189 (D.C. Cir. 2000) ("'[W]here there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter [dictum], but each is the judgment of the court, and of equal validity with the other.'" (quoting *Dooling v. Overholser*, 243 F.2d 825, 828 (D.C. Cir. 1957) (internal quotations omitted))).

[2]*See Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1184 (D.C. Cir. 2004) ("While the pilots protest that without knowledge of the specific evidence on which TSA relied, they are unable to defend against the charge that they are security risks, the court has rejected the same argument in the terrorism listing cases. The due process protections afforded to them parallel those provided under similar circumstances in [*NCRI I* and *PMOI II*], and are sufficient to satisfy our case law."); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003) ("That the designation comes under an Executive Order issued under a different statutory scheme makes no difference. HLF's complaint, like that of the Designated [FTOs] in the earlier cases, that due process prevents its designation based upon classified information to which it has not had access[,] is of no avail.").

our AEDPA precedent as binding and are, in any event, binding themselves.

According to the Secretary, however, as in *NCRI I* her decision was based on both classified and unclassified material. Because the PMOI had no opportunity to access/rebut the unclassified portions before the Secretary's decision was final, it is not clear that she would have denied the revocation petition had that material been made available to the PMOI earlier. In addition, the Secretary herself appears to have recognized the ambiguity of the record by recommending a *sua sponte* reexamination of the PMOI's status in two years. Revised Admin. Summ. 20 ("In light of the evidence submitted by the MEK that it has renounced terrorism and the uncertainty surrounding the MEK presence in Iraq, the continued designation of the MEK should be re-examined by the Secretary of State in the next two years even if the MEK does not file a petition for revocation."). In short, were I confident that she had evaluated and relied on what I consider to be the substantial support contained in the classified record only (along with the sources therefor), I would affirm. Because I am not, I join my colleagues in remanding to the Secretary.